## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **GROTON DUNSTABLE REGIONAL SCHOOL DISTRICT**<br><br>**Plaintiff**<br><br>**v.**<br><br>**LAIDLAW TRANSIT, INC.**<br><br>**Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No. 05-10978-PBS**

### AFFIDAVIT OF MARY B. MCGRATH

I, Mary B. McGrath, hereby depose and state the following:

1.     I am a legal assistant and environmental engineer with McDermott Will & Emery LLP ("McDermott") in Boston, Massachusetts. I have held this position since June 1998.

2.     Beginning in January 2005, I have been involved in the dispute that has become the subject of this action.

3.     In February 2005, I visited Social Law Library in Boston, manually searched the indices and Table of Contents of the Massachusetts General Laws and the Code of Massachusetts Regulations to identify laws and regulations potentially applicable to this action, and then read each potentially applicable section. I looked for words and phrases such as "epinephrine", "epi-pen", "auto-injector", "food allergy", "administration of medicine", "school bus", "school bus driver", "licensing of school bus driver", "student health", "first aid", "first aid kit", "medical emergencies", and "emergency medical treatment". I double-checked my research by conducting on-line

1

keyword searches of the Massachusetts General Laws at

http://www.mass.gov/legis/laws/mgl/, reviewing the Massachusetts statutes and

regulations maintained at the McDermott library in Boston, and searching the websites of

Massachusetts agencies such as the Department of Education ("MA DOE"), the

Massachusetts Department of Public Health ("MA DPH"), and the Registry of Motor

Vehicles ("MA RMV"). I believe that my research was diligent, thorough, and well

conducted. I updated my research by reviewing the same statutes on-line and by

reviewing the same statutes and regulations in our firm's library.

### Epinephrine and Epi-Pens

4.      I found no reference to "epinephrine" and "epi-pens" in the Massachusetts

statutes related to this action. The pertinent regulation, 105 CMR 210.100,

"Administration of Epinephrine" (a current copy of which is attached hereto as Tab A),

permits a public school district or non-public school to voluntarily register with MA DPH

for the limited purpose of:

> "permitting properly trained school personnel to administer epinephrine by
> auto injector in a life-threatening situation during the school day when a
> school nurse is not immediately available, including field trips".

5.      The program is strictly voluntarily; however, if a community chooses to

participate in the program, it must comply with several regulations.

6.      The voluntary program and its associated regulations give broad powers to

the school nurse, who is responsible for the school's program of epinephrine

administration, including development of policies and written plans; coordination with all

interested parties; registration of the program with the MA DPH; selection, competency

testing, and training of individuals authorized to administer the medication; and

2

recordkeeping. The school nurse has final decision-making authority about the program, in consultation with the school physician, and the school committee approves the policies developed by the nurse. Persons authorized to administer epinephrine must meet the requirements of 105 CMR 210.004(B)(2). The parents of affected students must approve the program, including the individuals selected to administer epinephrine, in writing.

7.    My extensive review of the Commonwealth's education statutes and regulations yielded no definition for the terms "school personnel" and "school day", nor did I see any authority suggesting that bus drivers are, in fact, "school personnel".

8.    I noted during my research in February 2005 that the versions of the epinephrine administration regulations posted on the MA DPH's website differ from those appended to the MA DOE's guidance document (discussed below) and both versions are now outdated. I purchased the most current version of 105 CMR 210.000 (which is included at Tab A) from the State Bookstore on February 18, 2005 and confirmed that the version maintained in McDermott's library was also up-to-date. The current version adds a final paragraph that clarifies that administration of epinephrine shall be governed solely by 105 CMR 210.100. In other words, other MA DPH regulations, such as those that govern administration of prescription medications in schools, do not apply to the administration of epinephrine, with limited exception.

### First Aid

9.    I found two references to "first aid" in the Massachusetts statutes and regulations in connection with school busing activity. The motor vehicle statute pertaining to equipment and operation of school buses requires that school buses be equipped with first aid kits. M.G.L. 90, § 7B(13). Attached hereto at Tab B is a copy of that statute. The motor vehicle regulations require each school bus to carry a first aid kit

3

and specify the contents, and in some cases, the number of and dimensions of particular

contents. The contents shall include adhesive tape rolls, sterile gauze pads, adhesive

bandages, bandage compresses, sterile gauze roller bandages, non-sterile triangular

bandages with safety pins, sterile gauze pads, sterile eye pads, rounded end scissors,

medical examination gloves, and a mouth-to-mouth airway. 540 CMR 7.06(2). Attached

hereto at Tab C is a copy of that regulation. Neither the statute nor regulation cited above

references epi-pens, epinephrine, auto-injectors, or other food allergy-related words or

phrases. In addition, I did not find a definition of "First Aid" in these statutes or

regulations.

### First Aid Training

10.    I found no reference to any requirement that school bus drivers in

Massachusetts be trained in the administration of first aid to students riding buses. The

Massachusetts statute pertaining to school bus driver training (M.G.L. 90, § 8A) requires

satisfactory completion of a pre-service school bus driver training program and, for all

renewal applications, subsequent completion of an in-service driver training program.

Both training programs are to be established by the commissioner of education in

collaboration with the registrar and the commissioner of the department of

telecommunications and energy. Attached hereto at Tab D is a copy of that statute. I was

unable to locate the syllabus for such courses on the Internet after a limited search. Based

on my work, and after inquiry of Laidlaw management, Laidlaw knows of no

requirement that first aid training be included in the bus company's training modules.

The Massachusetts regulation pertaining to school bus driving training programs is

slightly more specific about training requirements, but, like the statute, does not outline

4

the content of the training. 540 CMR 8.03. Attached hereto at Tab E is a copy of that regulation.

11.     The plaintiff's Memorandum of Law in Support of Plaintiff's Application for Preliminary Injunction states at Page 13:

> "The United States Department of Labor states that first aid is a part of this pre-service training (Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook*, 2004-05 Edition, Bus Drivers, on the Internet at http://www.bls.gov/oco/ocos242htm)."

12.     I reviewed that website; the citation references neither a statute nor regulation, and simply provides the U.S. Department of Labor's job description for bus drivers. It states, among other things, that school bus drivers are required to obtain a commercial driver's license from the State in which they live, and that they receive between 1 and 4 weeks of driving instruction plus classroom training on State and local laws, regulations, and policies of operating school buses; safe driving practices; driver-pupil relations; first aid; special needs of disabled and emotionally troubled students; and emergency evacuation procedures. Attached hereto at Tab F is a copy of that website.

### Summary of Statutory and Regulatory Review

13.     In summary, I did not find a Massachusetts statute or regulation that requires or authorizes school bus drivers to administer epinephrine to children with life-threatening allergies while riding a school bus, to be trained in first aid, or to administer first aid to children riding on school buses.

### MA DOE Guidance

14.     I also reviewed the 84-page guidance document entitled "Managing Life Threatening Food Allergies in Schools" that was published in 2002 by MA DOE (the "Guidance"). The Guidance is available on-line at

5

http://www.doe.mass.edu/cnp/news02/allergy.pdf. Select pages from the Guidance are attached herein at Tab G.

15.     To my knowledge, information and belief, the Guidance does not have the force of law, either as a statute or an administrative regulation.

16.     The Guidance references epi-pens and epinephrine on almost half of its pages.

17.     Page 17 of the Guidance outlines four suggested allergy-preventive measures to be taken specifically in connection with school buses. These suggested measures do not include a recommendation that bus drivers be trained in the administration of epi-pens.

18.     Page 35 of the Guidance identifies five recommended responsibilities of the school bus company if a student experiences a life-threatening allergy. The suggested responsibilities do not include a recommendation that school bus drivers administer epinephrine to the child.

The above facts are true to the best of my knowledge, information and belief.

Signed under the pains and penalties of perjury this ___6___<sup>th</sup> day of ___June___, 2005.

*Mary B. McGrath*

Mary B. McGrath

Attachments:

| | |
|---|---|
| A | 105 CMR 210.100 |
| B | M.G.L.90, § 7B(13) |
| C | 540 CMR 7.06(2) |
| D | M.G.L. 90, § 8A |
| E | 540 CMR 8.03 |
| F | U.S. Department of Labor Website |

6

G Select Pages from Massachusetts Department of Education Guidance Document "Managing Life Threatening Food Allergies in Schools"

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I have caused to be served a true and correct copy of

the Affidavit of Mary B. McGrath, by facsimile and hand delivery upon plaintiff's

counsel as follows:

> Rosann DiPietro, Esq.
> LONG & LONG
> 21 McGrath Highway, Suite 306
> Quincy, Massachusetts 02169
>
> Howard L. Greenspan, Esq.
> 220 Broadway
> Lynnfield, MA 01940


_____/s/_____
James J. Marcellino, Esq.

Dated:  June 6, 2005

- 7 -

**A**



THE COMMONWEALTH OF MASSACHUSETTS
William Francis Galvin, Secretary of the Commonwealth
State Publications and Regulations

## REGULATION FILING AND PUBLICATION

1 Regulation Chapter, Number & Heading:      **105 CMR 200.000 - 299.000**

2. Name of Agency:      **DEPARTMENT OF PUBLIC HEALTH**

3 This document is reprinted from the Code of Massachusetts Regulations and contains the following:

| 105 CMR | | |
|---|---|---|
| | 200.000 | Physical Examination of School Children |
| | 201.000 - 204.000 | Reserved |
| | 205.000 | Minimum Standards Governing Medical Records & the Conduct of Physical Examinations in Correctional Facilities. |
| | 206.000 - 209.000 | Reserved |
| | 210.000 | the Administration of Prescription Medications in Public & Private Schools. |
| | 211.000 - 219.000 | Reserved |
| | 220.000 | Immunization of Students Before Admission to School. |
| | 221.000 | Promoting Awareness of Meningococcal Disease and Vaccine |
| | 222.00 - 229.000 | Reserved |
| | 230.000 | Healthy Start Program |
| | 231.000 - 239.000 | Reserved |
| | 240.000 | Criteria for Insurance Coverage of Bone Marrow Transplants for Breast Cancer Patients. |
| | 241.000 - 259.000 | Reserved |
| | 260.000 | Prohibition Against Certain Fishing in New Bedford. |
| | 261.000 - 269.000 | Reserved |
| | 270.000 | Testing of Newborn Children for Treatable Diseases. |
| | 271.000 - 299.000 | Reserved |

Under the Provisions of Massachusetts General Laws, Chapter 30A, § 6. and Chapter 233, § 75.
this document may be used as evidence of the original documents on file with the Secretary of the Commonwealth

Compiled as in full force and effect:        02/11/2005

A true copy attest:

*William Francis Galvin*

WILLIAM FRANCIS GALVIN
Secretary of the Commonwealth

```
105 CMR 200-299
105CR200-299.00
||||||||||||||||||||  $4.35
       100024
```

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

105 CMR 210.000:    THE ADMINISTRATION OF PRESCRIPTION MEDICATIONS IN PUBLIC
                    AND PRIVATE SCHOOLS

Section

210.001:  Purpose
210.002:  Definitions
210.003:  Policies Governing the Administration of Prescription Medications in Schools
210.004:  Policies Regarding Delegation of Prescription Medication Administration
210.005:  Responsibilities of the School Nurse Regarding Prescription Medication Administration
210.006:  Self Administration of Prescription Medications
210.007:  Training of School Personnel Responsible for Administering Prescription Medications
210.008:  Handling, Storage and Disposal of Prescription Medications
210.009:  Documentation and Record-Keeping
210.100:  Administration of Epinephrine

210.001:  Purpose

The purpose of 105 CMR 210.000 is to provide minimum standards for the safe and proper
administration of prescription medications to students in the Commonwealth's public and private
primary and secondary schools. 105 CMR 210.000 permit school nurses to delegate
responsibility for administration of prescription medications to trained, nursing-supervised
school personnel, provided the school district or private school registers with the Department
of Public Health. The aim of 105 CMR 210.000 is to ensure that students requiring prescription
medication administration during the school day will be able to attend school and to ensure that
prescription medications are safely administered in schools.  105 CMR 210.000 encourages
collaboration between parents or guardians and the school in this effort.

210.002:  Definitions

As used in 105 CMR 210.000, the following words, unless the context clearly requires
otherwise, shall have the following meanings:

Administration of Medication means the direct application of a prescription medication by
inhalation, ingestion, or by any other means to the body of a person.

Prescription Medication means any medication which by federal law may be obtained only by
prescription.

Cumulative Health Record means the cumulative health record of a pupil as specified under
M.G.L. c. 71.

Department means the Massachusetts Department of Public Health.

Investigational New Drug means any medication with an approved investigational new drug
(IND) application on file with the Food and Drug Administration (FDA) which is being
scientifically tested and clinically evaluated to determine its efficacy, safety and side effects and
which has not yet received FDA approval.

Licensed Practical Nurse means an individual who is a graduate of an approved practical nursing
program, and who is currently licensed as a practical nurse pursuant to M.G.L. c. 112.

Licensed Prescriber means a health care provider who is legally authorized to prescribe
medication pursuant to M.G.L. c. 94C and applicable federal laws and regulations.

Parenteral Medication means any medication administered in a manner other than by the
digestive tract or topical application, as by intravenous, intramuscular, subcutaneous, or
intradermal injection.

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.002:  continued

Physician means a doctor of medicine or osteopathy licensed to practice medicine in Massachusetts or in another state.

School Nurse means a nurse practicing in a school setting, who is:
(1)  a graduate of an approved school for professional nursing;
(2)  currently licensed as a Registered Nurse pursuant to M.G.L. c. 112; and
(3)  appointed by a School Committee or a Board of Health in accordance with M.G.L. c. 71, §§ 53, 53A, and 53B or, in the case of a private school, by the Board of Trustees.

School Physician means a physician appointed by a School Committee or Board of Health in accordance with M.G.L. c. 71, §§ 53, 53A, and 53B or, in the case of a private school, by the Board of Trustees.

Supervision means guidance by a qualified school nurse to accomplish a task, with initial direction and instruction concerning the task and periodic inspection and oversight of activities related to the task.

Teacher for the purpose of 105 CMR 210.000, means a professional school employee who:
(1)  instructs students or serves in the role of administrator below the rank of superintendent; and
(2)  is employed by a School Committee or Board of Trustees.

210.003:  Policies Governing the Administration of Prescription Medications in Schools

(A)  The School Committee or Board of Trustees, consulting with the Board of Health where appropriate, shall adopt policies and procedures governing the administration of prescription medications and self administration of prescription medications within the school system, following development of a proposal by the school nurse, in consultation with the school physician. Review and revision of such policies and procedures shall occur as needed but at least every two years. At a minimum, these policies shall include:
(1)  designation of a school nurse as supervisor of the prescription medication administration program in a school;
(2)  documentation of the administration of prescription medications;
(3)  response to a medication emergency;
(4)  storage of prescription medications;
(5)  reporting and documentation of medication errors;
(6)  dissemination of information to parents or guardians. Such information shall include an outline of a school's medication policies and shall be available to parents and guardians upon request;
(7)  procedures for resolving questions between the school and a parent or guardian regarding administration of medications. Such procedures shall provide for and encourage the participation of the parent or guardian. Existing procedures for resolution of differences may be used whenever appropriate.

(B)  The School Committee or Board of Trustees shall submit these policies and procedures to the Department of Public Health upon request.

210.004:  Policies Regarding Delegation of Prescription Medication Administration

(A)  The School Committee or Board of Trustees, consulting with the Board of Health where appropriate, may approve a proposal, developed by the school nurse and school physician, to permit the administration of prescription medications to be delegated by the school nurse to unlicensed school personnel. Such delegation may occur only if the school district registers with the Department of Public Health pursuant to the applicable provisions of 105 CMR 700.000 and complies with the requirements of 105 CMR 210.000.



105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210 004:  continued

(B)  In accordance with the proposal of the school nurse and school physician, the School Committee or Board of Trustees may approve categories of unlicensed school personnel to whom the school nurse may delegate responsibility for prescription medication administration

(1)  Said categories of personnel may include administrative and teaching staff, licensed health personnel, health aides and secretaries

(a)  For the purposes of 105 CMR 210 000, health aide shall mean an unlicensed employee of the school district who is generally supervised by the school nurse and performs those health-related duties defined by the school nurse, the School Committee, Board of Health or Board of Trustees

(b)  For the purpose of administering emergency prescription medication to an individual child, including parenteral administration of medication pursuant to 105 CMR 210 004(B)(4), the school nurse may identify individual school personnel or additional categories  Said school personnel shall be listed on the medication administration plan developed in accordance with 105 CMR 210.005(E) and receive training in the administration of emergency medication to a specific child

(2)  An individual in an approved category may be authorized to administer prescription medication if he/she meets the following criteria:

(a)  is a high school graduate or its equivalent;

(b)  demonstrates sound judgment;

(c)  is able to read and write English;

(d)  is able to communicate with the student receiving the prescription medication or has ready access to an interpreter when needed;

(e)  is able to meet the requirements of 105 CMR 210 000 and follow nursing supervision;

(f)  is able to respect and protect the student's confidentiality; and

(g)  has completed an approved training program pursuant to 105 CMR 210.007

(3)  A school nurse shall be on duty in the school system while prescription medications are being administered by designated unlicensed school personnel, and available by telephone should consultation be required

(4)  The administration of parenteral medications may not be delegated, with the exception of epinephrine administered in accordance with 105 CMR 210 100

(5)  Prescription medications to be administered pursuant to p r n ("as needed") orders may be administered by authorized school personnel after an assessment by or consultation with the school nurse for each dose

(6)  For each school, an updated list of unlicensed school personnel who have been trained in the administration of prescription medications shall be maintained  Upon request, a parent shall be provided with a list of school personnel authorized to administer prescription medications

210.005:  Responsibilities of the School Nurse Regarding Prescription Medication Administration

(A)  The school nurse, in consultation with the school physician and the school health advisory committee, if established, shall develop policies and procedures consistent with 105 CMR 210 000 for approval by the School Committee or Board of Trustees, in consultation with the Board of Health where appropriate

(B)  The school nurse shall have responsibility for the development and management of the prescription medication administration program  Such responsibility shall be delineated in policies and procedures adopted by the School Committee or Board of Trustees, in consultation with the Board of Health where appropriate

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.005:  continued

(C)  The school nurse, in consultation with the school physician, shall have final decision-making authority with respect to delegating administration of prescription medications to unlicensed personnel in school systems registered with the Department of Public Health

(D)  Medication Orders.

(1)  The school nurse shall ensure that there is a proper medication order from a licensed prescriber which is renewed as necessary including the beginning of each academic year. A telephone order or an order for any change in prescription medication shall be received only by the school nurse. Any verbal order must be followed by a written order within three school days. Whenever possible, the medication order shall be obtained, and the medication administration plan specified in 105 CMR 210.005(E) shall be developed before the student enters or re-enters school.

(a)  In accordance with standard medical practice, a medication order from a licensed prescriber shall contain:

1.  the student's name;
2.  the name and signature of the licensed prescriber and business and emergency phone numbers;
3.  the name, route and dosage of medication;
4.  the frequency and time of medication administration;
5.  the date of the order;
6.  a diagnosis and any other medical condition(s) requiring medication, if not a violation of confidentiality or if not contrary to the request of a parent, guardian or student to keep confidential;
7.  specific directions for administration.

(b)  Every effort shall be made to obtain from the licensed prescriber the following additional information, as appropriate:

1.  any special side effects, contraindications and adverse reactions to be observed;
2.  any other medications being taken by the student;
3.  the date of return visit, if applicable

(2)  Special Medication Situations

(a)  For short-term prescription medications, i.e., those requiring administration for ten school days or fewer, the pharmacy-labelled container may be used in lieu of a licensed prescriber's order. If the nurse has a question, she may request a licensed prescriber's order.

(b)  For "over-the-counter" medications, i.e., non-prescription medications, the school nurse shall follow the Board of Registration in Nursing's protocols regarding administration of over-the-counter medications in schools.

(c)  Investigational new drugs may be administered in the schools with (1) a written order by a licensed prescriber, (2) written consent of the parent or guardian, and (3) a pharmacy-labelled container for dispensing. If there is a question, the school nurse may seek consultation and/or approval from the school physician to administer the medication in a school setting.

(3)  The school nurse shall ensure that there is a written authorization by the parent or guardian which contains:

(a)  the parent or guardian's printed name and signature and a home and emergency phone number;
(b)  a list of all medications the student is currently receiving, if not a violation of confidentiality or contrary to the request of the parent, guardian or student that such medication not be documented;
(c)  approval to have the school nurse or school personnel designated by the school nurse administer the prescription medication;
(d)  persons to be notified in case of a medication emergency in addition to the parent or guardian and licensed prescriber

105 CMR:   DEPARTMENT OF PUBLIC HEALTH

210.005:   continued

(E)  Medication Administration Plan:  The school nurse, in collaboration with the parent or
guardian whenever possible, shall establish a medication administration plan for each student
receiving a prescription medication. Whenever possible, a student who understands the issues
of medication administration shall be involved in the decision-making process and his/her
preferences respected to the maximum extent possible.   If appropriate, the medication
administration plan shall be referenced in any other health or educational plan developed
pursuant to St. 1972, c. 766 the Massachusetts Special Education Law (Individual Education
Plan under Chapter 766) or federal laws, such as the Individuals with Disabilities Education
Act (IDEA) or Section 504 of the Rehabilitation Act of 1973.
   (1)  Prior to the initial administration of the prescription medication, the school nurse
   shall assess the child's health status and develop a medication administration plan which
   includes:
      (a)  the name of the student;
      (b)  a medication order from a licensed prescriber, which meets the requirements of
      105 CMR 210.005(D)(1);
      (c)  the signed authorization of the parent or guardian, which meets the requirements
      of 105 CMR 210.005(D)(3);
      (d)  any known allergies to food or medications;
      (e)  the diagnosis, unless a violation of confidentiality or the parent, guardian or
      student requests that it not be documented;
      (f)  any possible side effects, adverse reactions or contraindications;
      (g)  the quantity of prescription medication to be received by the school from the
      parent or guardian;
      (h)  the required storage conditions;
      (i)  the duration of the prescription;
      (j)  the designation of unlicensed school personnel, if any, who will administer the
      prescription medication to the student in the absence of the nurse, and plans for
      back-up if the designated personnel are unavailable;
      (k)  plans, if any, for teaching self administration of the prescription medication;
      (l)  with parental permission, other persons, including teachers, to be notified of
      medication administration and possible adverse effects of the medication;
      (m)  when appropriate, the location where the administration of the prescription
      medication will take place;
      (n)  a plan for monitoring the effects of the medication;
      (o)  provision for prescription medication administration in the case of field trips and
      other short-term special school events. Every effort shall be made to obtain a nurse
      or school staff member trained in prescription medication administration to accompany
      students at special school events. When this is not possible, the school nurse may
      delegate prescription medication administration to another responsible adult. Written
      consent from the parent or guardian for the named responsible adult to administer the
      prescription medication shall be obtained. The school nurse shall instruct the
      responsible adult on how to administer the prescription medication to the child.

(F)  Developing Procedures for Administration of Prescription Medications.
   (1)  The school nurse shall develop procedures for the administration of prescription
   medications which shall include the following:
      (a)  A procedure to ensure the positive identification of the student who receives the
      medication;
      (b)  A system for documentation and record-keeping which meets the requirements
      of 105 CMR 210.009.
   (2)  The school nurse shall develop a system of documenting observations by the nurse
   or school personnel and communicating significant observations relating to prescription
   medication effectiveness and adverse reactions or other harmful effects to the child's
   parent or guardian and/or licensed prescriber;
   (3)  The school nurse shall develop and implement procedures regarding receipt and safe
   storage of prescription medications;

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.005:  continued

(4) The school nurse shall develop procedures for responding to medication emergencies, i.e., any reaction or condition related to administration of medication which poses an immediate threat to the health or well-being of the student. This includes maintaining a list of persons, with their phone numbers, to be contacted as appropriate, in addition to the parent/guardian, school nurse, licensed prescriber and other persons designated in the medication administration plan. Such persons may include other school personnel, the school physician, clinic or emergency room staff, ambulance services and the local poison control center;

(5) The school nurse shall develop procedures and forms for documenting and reporting prescription medication errors. The procedures shall specify persons to be notified in addition to the parent or guardian and nurse, including the licensed prescriber or school physician if there is a question of potential harm to the student. A medication error includes any failure to administer prescription medication as prescribed for a particular student, including failure to administer the prescription medication:

    (a)  within appropriate time frames;
    (b)  in the correct dosage;
    (c)  in accordance with accepted practice;
    (d)  to the correct student.

(6) The school nurse shall develop procedures to review reports of medication errors and take necessary steps to ensure appropriate prescription medication administration in the future.

(G) Delegation/Supervision.  When a School Committee or Board of Trustees, in consultation with the Board of Health where appropriate, has registered with the Department of Public Health and authorized categories of unlicensed school personnel to administer prescription medications, such personnel shall be under the supervision of the school nurse for the purposes of 105 CMR 210.000. The School Committee or Board of Trustees, in consultation with the Board of Health where appropriate, shall provide assurance that sufficient school nurse(s) are available to provide proper supervision of unlicensed school personnel. Responsibilities for supervision, at a minimum, shall include the following:

(1) After consultation with the principal or administrator responsible for a given school, the school nurse shall select, train and supervise the specific individuals, in those categories of school personnel approved by the School Committee or Board of Trustees, in consultation with the Board of Health where appropriate, who may administer prescription medications. When necessary to protect student health and safety, the school nurse may rescind such selection.

(2) The number of unlicensed school personnel to whom responsibility for prescription medication administration may be delegated is to be determined by:

    (a) the number of unlicensed school personnel the school nurse can adequately supervise on a weekly basis, as determined by the school nurse;
    (b) the number of unlicensed school personnel necessary, in the nurse's judgment, to ensure that the prescription medications are properly administered to each student.

(3) The school nurse shall support and assist persons who have completed the training specified in 105 CMR 210.007 to prepare for and implement their responsibilities related to the administration of prescription medication.

(4) The first time that an unlicensed school personnel administers medication, the delegating nurse shall provide supervision at the work site.

(5) The degree of supervision required for each student shall be determined by the school nurse after an evaluation of the appropriate factors involved in protecting the student's health, including but not limited to the following:

    (a) health condition and ability of the student;
    (b) the extent of training and capability of the unlicensed school personnel to whom the prescription medication administration is delegated;
    (c) the type of prescription medication; and
    (d) the proximity and availability of the school nurse to the unlicensed person who is performing the prescription medication administration.

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.005:  continued

(6)  For the individual child, the school nurse shall:
(a)  determine whether or not it is medically safe and appropriate to delegate prescription medication administration;
(b)  administer the first dose of the prescription medication, if:
1.  there is reason to believe there is a risk to the child as indicated by the health assessment, or
2.  the student has not previously received this prescription medication in any setting;
(c)  review the initial orders, possible side effects, adverse reactions and other pertinent information with the person to whom prescription medication administration has been delegated;
(d)  provide supervision and consultation as needed to ensure that the student is receiving the prescription medication appropriately. Supervision and consultation may include record review, on-site observation and/or assessment;
(e)  review all documentation pertaining to prescription medication administration on a biweekly basis or more often if necessary.

(H)  In accordance with standard nursing practice, the school nurse may refuse to administer or allow to be administered any prescription medication which, based on her/his individual assessment and professional judgment, has the potential to be harmful, dangerous or inappropriate. In these cases, the parent/guardian and licensed prescriber shall be notified immediately by the school nurse.

(I)  For the purposes of 105 CMR 210.000, a Licensed Practical Nurse functions under the general supervision of the school nurse who has delegating authority.

(J)  The school nurse shall have a current pharmaceutical reference available for her/his use, such as the *Physician's Desk Reference* (P.D.R.) or *U.S.P. DI* (Dispensing Information), *Facts and Comparisons*.

210.006:  Self Administration of Prescription Medications

(A)  Consistent with school policy, students may self administer prescription medication provided that certain conditions are met. For the purposes of 105 CMR 210.000, "self administration" shall mean that the student is able to consume or apply prescription medication in the manner directed by the licensed prescriber, without additional assistance or direction.

(B)  The school nurse may permit self medication of prescription medication by a student provided that the following requirements are met:
(1)  the student, school nurse and parent/guardian, where appropriate, enter into an agreement which specifies the conditions under which prescription medication may be self administered;
(2)  the school nurse, as appropriate, develops a medication administration plan (105 CMR 210.005(E) which contains only those elements necessary to ensure safe self administration of prescription medication;
(3)  the school nurse evaluates the student's health status and abilities and deems self administration safe and appropriate. As necessary, the school nurse shall observe initial self-administration of the prescription medication;
(4)  the school nurse is reasonably assured that the student is able to identify the appropriate prescription medication, knows the frequency and time of day for which the prescription medication is ordered, and follows the school self administration protocols;
(5)  there is written authorization from the student's parent or guardian that the student may self medicate, unless the student has consented to treatment under M.G.L. c. 112, § 12F or other authority permitting the student to consent to medical treatment without parental permission;

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.006:  continued

(6)  if requested by the school nurse, the licensed prescriber provides a written order for self administration;

(7)  the student follows a procedure for documentation of self-administration of prescription medication;

(8)  the school nurse establishes a policy for the safe storage of self-administered prescription medication and, as necessary, consults with teachers, the student and parent/guardian, if appropriate, to determine a safe place for storing the prescription medication for the individual student, while providing for accessibility if the student's health needs require it. This information shall be included in the medication administration plan. In the case of an inhaler or other preventive or emergency medication, whenever possible, a backup supply of the prescription medication shall be kept in the health room or a second readily available location;

(9)  the school nurse develops and implements a plan to monitor the student's self administration, based on the student's abilities and health status. Monitoring may include teaching the student the correct way of taking the prescription medication, reminding the student to take the prescription medication, visual observation to ensure compliance, recording that the prescription medication was taken, and notifying the parent, guardian or licensed prescriber of any side effects, variation from the plan, or the student's refusal or failure to take the prescription medication;

(10)  with parental/guardian and student permission, as appropriate, the school nurse may inform appropriate teachers and administrators that the student is self-administering a prescription medication.

210.007:  Training of School Personnel Responsible for Administering Prescription Medications

(A)  All prescription medications shall be administered by properly trained and supervised school personnel under the direction of the school nurse.

(B)  Training shall be provided under the direction of the school nurse.

(C)  At a minimum, the training program shall include content standards and a test of competency developed and approved by the Department of Public Health in consultation with the Board of Registration in Nursing and practicing school nurses.

(D)  Personnel designated to administer prescription medications shall be provided with the names and locations of school personnel who have documented certification in cardiopulmonary resuscitation. Schools should make every effort to have a minimum of two school staff members with documented certification in cardiopulmonary resuscitation present in each school building throughout the day.

(E)  The school nurse shall document the training and evidence of competency of unlicensed personnel designated to assume the responsibility for prescription medication administration.

(F)  The school nurse shall provide a training review and informational update at least annually for those school staff authorized to administer prescription medications.

210.008:  Handling, Storage and Disposal of Prescription Medications

(A)  A parent, guardian or parent/guardian-designated responsible adult shall deliver all prescription medications to be administered by school personnel or to be taken by self-medicating students, if required by the self-administration agreement (105 CMR 210.006(B)), to the school nurse or other responsible person designated by the school nurse.

(1)  The prescription medication must be in a pharmacy or manufacturer labelled container.

(2)  The school nurse or other responsible person receiving the prescription medication shall document the quantity of the prescription medication delivered

105 CMR:    DEPARTMENT OF PUBLIC HEALTH

210.008:    continued

(3)  In extenuating circumstances, as determined by the school nurse, the prescription medication may be delivered by other persons; provided, however, that the nurse is notified in advance by the parent or guardian of the arrangement and the quantity of prescription medication being delivered to the school

(B)  All prescription medications shall be stored in their original pharmacy or manufacturer labelled containers and in such manner as to render them safe and effective.

(C)  All prescription medications to be administered by school personnel shall be kept in a securely locked cabinet used exclusively for medications, which is kept locked except when opened to obtain medications  The cabinet shall be substantially constructed and anchored securely to a solid surface  Prescription medications requiring refrigeration shall be stored in either a locked box in a refrigerator or in a locked refrigerator maintained at temperatures of 38°F to 42°F

(D)  Access to stored prescription medications shall be limited to persons authorized to administer prescription medications and to self-medicating students, to the extent permitted by school policy developed pursuant to 105 CMR 210.006(B)(B).  Access to keys and knowledge of the location of keys shall be restricted to the maximum extent possible.  Students who are self-medicating shall not have access to other students' medications

(E)  Parents or guardians may retrieve the prescription medications from the school at any time

(F)  No more than a 30 school day supply of the prescription medication for a student shall be stored at the school

(G)  Where possible, all unused, discontinued or outdated prescription medications shall be returned to the parent or guardian and the return appropriately documented. In extenuating circumstances, with parental consent when possible, such prescription medications may be destroyed by the school nurse in accordance with any applicable policies of the Massachusetts Department of Public Health, Division of Food and Drugs

210.009:    Documentation and Record-Keeping

(A)  Each school where prescription medications are administered by school personnel shall maintain a medication administration record for each student who receives prescription medication during school hours
(1)  Such record at a minimum shall include a daily log and a medication administration plan, including the medication order and parent/guardian authorization
(2)  The medication administration plan shall include the information as described in 105 CMR 210.005(E).
(3)  The daily log shall contain:
(a)  the dose or amount of prescription medication administered;
(b)  the date and time of administration or omission of administration, including the reason for omission;
(c)  the full signature of the nurse or designated unlicensed school personnel administering the prescription medication  If the prescription medication is given more than once by the same person, he/she may initial the record, subsequent to signing a full signature.
(4)  The school nurse shall document in the medication administration record significant observations of the prescription medication's effectiveness, as appropriate, and any adverse reactions or other harmful effects, as well as any action taken.
(5)  All documentation shall be recorded in ink and shall not be altered

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210.009:  continued

(6)  With the consent of the parent, guardian, or student where appropriate, the completed prescription medication administration record and records pertinent to self administration shall be filed in the student's cumulative health record  When the parent, guardian or student, where appropriate, objects, these records shall be regarded as confidential medical notes and shall be kept confidential, except as provided in 105 CMR 210.000

(B)  Medication errors, as defined in 105 CMR 210.005(F)(5), shall be documented by the school nurse on an accident/incident report form  These reports shall be retained in a location as determined by school policy and made available to the Department of Public Health upon request  All suspected diversion or tampering of drugs shall be reported to the Department of Public Health, Division of Food and Drugs  All medication errors resulting in serious illness requiring medical care shall be reported to the Department of Public Health, Bureau of Family and Community Health

(C)  The school district shall comply with the Department of Public Health's reporting requirements for prescription medication administration in the schools

(D)  The Department of Public Health may inspect any individual student medication record or record relating to the administration or storage of prescription medications without prior notice to ensure compliance with 105 CMR 210.000

210.100:  Administration of Epinephrine

(A)  A public school district or non-public school, as defined by the Massachusetts Department of Education, may register with the Department for the limited purpose of permitting properly trained school personnel to administer epinephrine by auto injector in a life-threatening situation during the school day when a school nurse is not immediately available, including field trips, provided that the following conditions are met:
(1)  the school committee or, in the case of a non-public school, the chief administrative officer, approves policies developed by the designated school nurse leader or, in the absence of a school nurse leader, a school nurse with designated responsibility for management of the program ("responsible school nurse") governing administration of epinephrine by auto injector  This approval must be renewed every two years;
(2)  the school committee or chief administrative officer provides an assurance to the Department that the requirements of 105 CMR 210.000 will be met;
(3)  in consultation with the school physician, the designated school nurse leader or responsible school nurse manages and has final decision making authority about the program  This person, or school nurses designated by this person, shall select the individuals authorized to administer epinephrine by auto injector  Persons authorized to administer epinephrine shall meet the requirements of 105 CMR 210.004(B)(2);
(4)  the school personnel authorized to administer epinephrine by auto injector are trained and tested for competency by the designated school nurse leader or responsible school nurse, or school nurses designated by this person, in accordance with standards and a curriculum established by the Department
(a)  The designated school nurse leader or responsible school nurse, or school nurses designated by this person, shall document the training and testing of competency
(b)  The designated school nurse leader or responsible school nurse, or a designee, shall provide a training review and informational update at least twice a year
(c)  The training, at a minimum, shall include:
1  procedures for risk reduction
2  recognition of the symptoms of a severe allergic reaction;
3  the importance of following the medication administration plan;
4  proper use of the auto-injector; and
5  requirements for proper storage and security, notification of appropriate persons following administration, and record keeping
(d)  The school shall maintain and make available upon request by parents or staff a list of those school personnel authorized and trained to administer epinephrine by auto injector in an emergency, when the school nurse is not immediately available;

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210 100:  continued

(5) epinephrine shall be administered only in accordance with an individualized medication administration plan satisfying the applicable requirements of 105 CMR 210 005(E) and 210.009(A)(6). updated every year, which includes the following:

(a)  a diagnosis by a physician that the child is at risk of a life threatening allergic reaction and a medication order containing proper dosage and indications for administration of epinephrine;

(b)  written authorization by a parent or legal guardian;

(c)  home and emergency number for the parent(s) or legal guardian(s), as well as the names(s) and phone number(s) of any other person(s) to be notified if the parent(s) or guardian(s) are unavailable;

(d)  identification of places where the epinephrine is to be stored, following consideration of the need for storage:

1  at one or more places where the student may be most at risk;

2  in such a manner as to allow rapid access by authorized persons, including possession by the student when appropriate; and

3  in a place accessible only to authorized persons  The storage location(s) should be secure, but not locked during those times when epinephrine is most likely to be administered, as determined by the school nurse;

(e)  a list of the school personnel who would administer the epinephrine to the student in a life threatening situation when a school nurse is not immediately available;

(f)  a plan for comprehensive risk reduction for the student, including preventing exposure to specific allergens; and

(g)  an assessment of the student's readiness for self-administration and training, as appropriate

(6)  when epinephrine is administered, there shall be immediate notification of the local emergency medical services system (generally 911), followed by notification of the student's parent(s) or guardian(s) or, if the parent(s)or guardian(s) are not available, any other designated person(s), the school nurse, the student's physician, and the school physician, to the extent possible;

(7)  there shall be procedures, in accordance with any standards established by the Department, for:

(a)  developing the medication administration plan;

(b)  developing general policies for the proper storage of medication, including limiting access to persons authorized to administer the medication and returning unused or outdated medication to a parent or guardian whenever possible;

(c)  recording receipt and return of medication by the school nurse;

(d)  documenting the date and time of administration;

(e)  notifying appropriate parties of administration and documenting such notification;

(f)  reporting medication errors in accordance with 105 CMR 210 005(F)(5);

(g)  reviewing any incident involving administration of epinephrine to determine the adequacy of the response and to consider ways of reducing risks for the particular student and the student body in general;

(h)  planning and working with the emergency medical system to ensure the fastest possible response;

(i)  disposing properly of used epinephrine injector;

(j)  submitting a written report to the Department of Public Health each time epinephrine is administered to a student or staff, on a form obtained from the Department;

(k)  permitting the Department of Public Health to inspect any record related to the administration of epinephrine without prior notice, to ensure compliance with 105 CMR 210 100

(B)  Epinephrine may be administered in accordance with 105 CMR 210.000 in before and after school programs offered or provided by a school, such as athletic programs, special school events and school-sponsored programs on week-ends, provided that the public school district or non-public school is registered with the Department pursuant to 105 CMR 210 100(A) and meets the requirements set forth in 105 CMR 210 100(B)

(1)  Epinephrine may be administered in such before and after school programs and special events, to students attending the school where the epinephrine is to be administered, provided that the following requirements in 105 CMR 210 1000(B)(1)(a) through (d) are met:

105 CMR:  DEPARTMENT OF PUBLIC HEALTH

210 100:  continued

(a)  school committee or chief administrative officer in a non-public school approves, in the policy developed in accordance with 105 CMR 210.100(A)(1), administration of epinephrine in such programs  The policy shall identify the school official(s), along with a school nurse for each school designated by the school nurse leader or responsible nurse, responsible for determining which before and after school programs and special events are to be covered by the policy;

(b)  the designated school nurse approves administration of epinephrine in that program and selects the properly trained person(s) to administer the epinephrine;

(c)  the school complies with the requirements of 105 CMR 210 100(A), including immediate notification of emergency medical services following administration of epinephrine, but need not comply with the requirement of 105 CMR 210 004(B)(3); and

(d)  the program is not licensed by another state agency, in which case the regulations promulgated by that state agency will apply

(2)  Epinephrine may be administered in such before and after school programs and special events to students from another school or school district if approved in the school policy developed pursuant to 105 CMR 210 100(A)(1) and in accordance with the requirements in 105 CMR 210 00(B)(2)(a) through (d)

(a)  The school complies with the requirements of 105 CMR 210 100(A) and 210 100(B)(1), including immediate notification of emergency medical services following administration of epinephrine, except as provided in 105 CMR 210 100(B)(2)(d)

(b)  In the event the student is accompanied by school personnel from the sending school, such personnel whenever possible, shall assume responsibility for ensuring that the epinephrine is brought properly stored and administered as necessary, in accordance with the medication administration plan developed by the sending school in accordance with 105 CMR 210 100(A)(5)

(c)  In the event the student is not accompanied by school personnel from the sending school or such personnel are not trained in the administration of epinephrine, the receiving school may, in its discretion assume responsibility for administering epinephrine, provided that:

1  the designated school nurse in the receiving school is provided with adequate prior notice of the request which shall be at least one week in advance unless otherwise specified by the designated school nurse;

2  the designated school nurse in the receiving school approves administration of epinephrine for that student;

3  the designated school nurse selects properly trained person(s) to administer the epinephrine; and

the student provides the designated school nurse or the person(s) selected by the

4  designated school nurse to administer epinephrine with the medication to be administered

(d)  If the receiving school assumes responsibility for administering epinephrine, whenever possible, the student shall provide the designated school nurse in the receiving school with copy of the medication administration plan developed in accordance with 105 CMR 210 005(E)  The plan shall be provided to the designated school nurse in timely fashion in accordance with procedures established by the nurse  If no medication administration plan is provided, the student at a minimum shall provide to the designated school nurse in the receiving school:

1  written authorization and emergency phone numbers from a parent or guardian;

2  a copy of a medication order from a licensed provider; and

3  any specific indications or instructions for administration

(C)  Administration of epinephrine shall be governed solely by 105 CMR 210 100  The provisions of 105 CMR 210.004(B)(5) and 210 005(E)(1)(o) shall not be applicable to the administration of epinephrine

REGULATORY AUTHORITY

105 CMR 210 000:  M G L  c 94C, § 7(g); c 71, § 54B

105 CMR:   DEPARTMENT OF PUBLIC HEALTH

(105 CMR 211.000 through 219.000:  RESERVED)

105 CMR:   DEPARTMENT OF PUBLIC HEALTH

(PAGES 1183 THROUGH 1196 ARE RESERVED FOR FUTURE USE.)

**B**

costs recoverable on fee-setting principles or that, to extent that $4.00 might prove to be unrelated to recovery of costs, it exceeded in amount the range which was within specific contemplation of legislature when it vested fee-setting power in Secretary. Robinson v. Secretary of Administration (1981) 425 N.E.2d 772, 12 Mass.App.Ct. 441.

Fiscal impact statement, which related to Secretary of Administration's regulation establishing a fee for automobile safety inspections and which provided detailed estimates of the revenue expected to be generated by the fee for the Commonwealth and the inspectors during the short period of time the regulation was to be in effect, based on the total number of vehicles to be inspected, was a sufficient statement. Robinson v. Secretary of Administration (1981) 425 N.E.2d 772, 12 Mass.App.Ct. 441.

St.1980, c. 572, § 36, which repealed provision setting a $2.00 fee for automobile safety inspections and which gave Secretary of Administration the power and duty to fix such fee annually, was to be construed as authorizing Secretary to set the fee at a level higher than the $2.00 fee and to provide for a portion of that fee to be remitted to the Commonwealth. Robinson v. Secretary of Administration (1981) 425 N.E.2d 772, 12 Mass.App.Ct. 441.

## § 7B. Equipment and operation of school buses

No person shall operate any school bus, and the owner or custodian of a school bus shall not permit the same to be operated upon or to remain upon any way, unless the following requirements are complied with:—(1) The words "SCHOOL BUS" shall be painted or otherwise displayed on the front and rear of each such vehicle in black letters of eight inches in height and conform to series "B" of the standard alphabets for highway signs on a National School Bus Yellow background, or shall be so painted upon signs attached to the front and rear of each vehicle. School buses being operated on a public highway and transporting primarily passengers other than school pupils shall have the words "SCHOOL BUS" covered, removed, or otherwise concealed, and stop arms and equipment required by clauses (7) and (11) shall not be activated during the transportation of such passengers; (2) The operator of a school bus shall not allow the number of school pupils riding in the bus at any one time to exceed the number of adequate thirteen inch seats therein nor shall the operator drive said bus until each pupil is seated; provided however, that any such bus, in which adequate straps, handles or other supports are available for standing passengers, may carry not more than three standees in any case of an emergency for a period not to exceed five consecutive school days; (3) All doors shall be kept closed while the bus is in motion; (4) Each school bus shall be operated by a person eighteen years of age or over who is licensed under section eight A or who is licensed under section nine of chapter one hundred and fifty-nine A and is subject to an annual physical examination in conformity with such minimum physical qualifications as shall be determined by the registrar in collaboration with the commissioner of the department of telecommunications and energy; provided, however, that in case of any emergency such school bus may, for a period not to exceed three consecutive school days, be operated by any person, eighteen years of age or over, who is duly licensed by his state of residence for operation of the class of vehicle being operated and has said license in his possession; and provided, further, that no person shall operate a school bus whose license to do so is suspended or revoked, or whose application to operate a school bus has been rejected by the registrar; (5) No fueling shall take place while any school bus is occupied by passengers; (6) Beginning with the chassis model year nineteen hundred and seventy-five and subsequent model years, each school bus body and fenders, shall be painted a

Case 1:05-cv-10978-PBS   Document 8-2   Filed 06/13/2005   Page 19 of 49

total number of vehicles to
sufficient statement.  Rob-
: Administration (1981) 425
App Ct 441.

36, which repealed provi-
: fee for automobile safety
:h gave Secretary of Admin-
and duty to fix such fee
: construed as authorizing
ee at a level higher than the
ide for a portion of that fee
e Commonwealth  Robin-
Administration (1981) 425
App Ct 441.


ier or custodian of a
in or to remain upon
with:—(1) The words
on the front and rear
eight and conform to
on a National School
; attached to the front
on a public highway
pupils shall have the
concealed, and stop
hall not be activated
erator of a school bus
ius at any one time to
herein nor shall the
ed however, that any
orts are available for
lees in any case of an
iol days; (3) All doors
h school bus shall be
ho is licensed under
chapter one hundred
ination in conformity
: determined by the
partment of telecom-
se of any emergency
secutive school days,
who is duly licensed
e being operated and
that no person shall
or revoked, or whose
the registrar; (5) No
d by passengers; (6)
and seventy-five and
rs, shall be painted a

color matching what is commonly known as "National School Bus Glossy Yellow" in accordance with United States motor vehicle D.O.T. Safety standard No. 17, as amended, and bumpers, lettering, wheels and trim shall be painted a glossy black, in accordance with such standard.  The hood of vehicles manufactured for model year nineteen hundred and seventy-five and subsequent model years shall be painted lusterless black or lusterless yellow, in accordance with federal standards.  This clause shall not apply to a motor vehicle operated under a certificate issued under section seven of chapter one hundred and fifty-nine A and a permit issued under section eight of said chapter which is designed primarily for other than pupil transportation; (7) Each school bus shall be equipped with Type I Class A turn signal lamps, which shall have a four-way hazard warning signal switch to cause simultaneous flashing of the turn signal lamps which may be activated when a bus is approaching a stop to load or discharge school pupils and when needed as a vehicular traffic hazard warning.  Each school bus shall also be equipped with front and rear alternating flashing school bus red signal lamps, which shall remain flashing when school pupils are entering or leaving the bus.  School buses manufactured with a chassis of nineteen hundred and eighty-four model year and thereafter shall be equipped with the eight-lamp system, so-called, which, in addition to the aforementioned lamps, shall include alternating flashing amber signal lamps of the same size as, and placed adjacent to, said red signal lamps, and which shall be activated when said bus is approaching a stop to load or discharge school pupils.  On buses equipped with the eight-lamp system, so-called, the use of the four-way hazard warning lamps for the purpose of warning motorists of the vehicle's impending stop to load or discharge school pupils shall be discontinued.  Use of alternating flashing school bus red signal lamps for any other purpose, and at any time other than when the school bus is stopped to load or discharge school pupils, shall be prohibited.  All aforementioned lamps shall comply with applicable Federal Motor Vehicle Safety Standards and any applicable rules and regulations promulgated by the registrar  The operator of a school bus shall cause its headlamps to be illuminated while such bus is in operation  Any person who operates such a bus shall not permit the boarding or discharging of school pupils therefrom unless the school bus is stopped as close as is practicable to the right-hand side or edge of the ways and shall announce when discharging passengers therefrom that all persons who wish to cross to the other side of the way shall do so by passing in front of the bus immediately upon alighting therefrom.  No person shall operate a school bus on a way after discharging passengers therefrom unless all persons who wish to cross to the other side have done so; (8) Every school bus shall be equipped with a safety belt for the operator thereof, and said operator shall securely fasten said seat belt while transporting school pupils; (9) Every school bus shall be equipped with two operable front windshield wipers; (10) No person shall smoke or consume alcoholic beverages on a school bus while such bus is being used to transport school pupils; (11) Type I and Type II school buses purchased, leased or contracted after January first, nineteen hundred and eighty-nine for use in the commonwealth shall be equipped with an octagonal stop warning device incorporating alternately flashing red lights approved by the

161

90 § 7B                                              PUBLIC WAYS AND WORKS

registrar and mounted in accordance with the registrar's regulations upon the left side and shall only be activated to extend outward when picking up or discharging school pupils. All other Type I and Type II school buses shall be so equipped with said device no later than January first, nineteen hundred and ninety-four. Such device, when fully extended, shall not protrude more than twenty-two inches outward from the left side of the body. The use of such device shall not be construed as increasing the width of such bus beyond the limits prescribed by section nineteen. The registrar shall promulgate rules and regulations providing for a certification process for the installation of said device; (12) Every school bus shall be equipped with at least one interior mirror and at least two flat-surfaced rectangular exterior mirrors approved by the registrar in accordance with regulations issued by the registrar. Further, every school bus shall be equipped with a system of mirrors that give the driver a view of the roadway to each side of the bus and of the area immediately in front of the front bumper in accordance with rules and regulations issued by the registrar. All such mirrors shall meet all applicable Federal motor vehicle safety standards; (13) Every school bus shall be equipped with a first-aid kit; (14) Any school bus meeting the identification requirements of this section that is permanently converted for use wholly for purposes other than transporting pupils to and from school shall be painted a contrasting color other than National School Bus Glossy Yellow, and shall have the equipment required by clauses (1), (7), and (11) removed; (15) All pupils transported in a school bus shall receive classroom instruction in safe riding practices at least three times during the following periods of each school year: the first week of the school year, the period between the months of September and January and the period between the month of January and the end of the school year. During each school year all such pupils shall participate at least twice in on-bus emergency evacuation drills; (16) School bus drivers shall be required to perform daily pretrip inspections of their buses and to report promptly in writing to their employer any defects or deficiencies discovered that may affect the safety of the vehicle's operation or result in its mechanical breakdown. Pretrip inspection and condition reports for school buses shall be performed in accordance with regulations established by the registrar and the commissioner of telecommunications and energy; (17) School bus drivers shall perform daily post-trip inspections of the interior of their buses including behind and underneath each seat. Any school bus driver who fails to perform such inspection shall be punished by a fine of not less than $50 nor more than $100; (18) Every school bus operated on any way shall be chassis model year 1977 or any subsequent model year.

The provisions of clauses (4) and (6) shall not apply to any vehicle having permanent seating accommodations for not more than fifteen passengers and used for the transportation of children enrolled in a camp, except that the driver of such a vehicle shall be a person eighteen years of age or over and of good moral character who is duly licensed by the registrar and has in his possession a Class 1 or Class 2 Massachusetts motor vehicle operator's license, and has not had a license to operate a school bus suspended or revoked nor had an application therefor denied.

; regulations upon the
when picking up or
school buses shall be
nineteen hundred and
it protrude more than
idy  The use of such
: such bus beyond the
promulgate rules and
ie installation of said
at least one interior
r mirrors approved by
he registrar.  Further,
ors that give the driver
e area immediately in
regulations issued by
Federal motor vehicle
ed with a first-aid kit;
nts of this section that
ther than transporting
ting color other than
equipment required by
ported in a school bus
:es at least three times
rst week of the school
anuary and the period
iol year  During each
e in on-bus emergency
aired to perform daily
itly in writing to their
affect the safety of the
vn  Pretrip inspection
ed in accordance with
sioner of telecommuni-
erform daily post-trip
d and underneath each
ih inspection shall be
100;  (18) Every school
977 or any subsequent

to any vehicle having
fifteen passengers and
camp, except that the
s of age or over and of
gistrar and has in his
iicle operator's license,
ded or revoked nor had

No school bus having seating accommodations for more than sixteen school pupils equipped with passenger restraint systems shall be operated on the ways of the commonwealth unless said passenger restraint systems meet the requirement of one passenger restraint system for each seated passenger;  and the minimum requirements of Federal Motor Vehicle Safety Standards for buckles, belts, and seats.  Only anchorages and seats installed as original equipment at time of manufacture of the school bus, or retrofitted by the original manufacturer of said school bus shall be used.  No school bus manufactured before nineteen hundred and seventy-seven equipped with passenger restraint systems shall be operated on the ways of the commonwealth.

In addition to the requirements of the preceding paragraph, every school bus having seating accommodations for more than sixteen school pupils manufactured or retrofitted with passenger restraint systems after July first, nineteen hundred and eighty-six shall have sets of belts at each seat which are distinctively color coded;  and each such belt shall consist of one nonadjustable buckle end no longer than twelve inches and one adjustable end no longer than twenty-nine inches;  and each seating position adjacent to an aisle shall have the nonadjustable buckle end mounted on the aisle side;  and each passenger restraint system shall comply with the minimum requirements of Federal Motor Vehicle Safety Standards for anchorages.

No person shall operate a moving school bus while using a mobile telephone except in the case of an emergency.  For the purpose of this paragraph, an emergency shall mean that the operator of the school bus needs to communicate with another to report any of the following: (a) that the school bus is disabled; (b) that medical attention or assistance is required for a passenger on the bus; (c) that police intervention is necessary for the personal safety of a passenger or to otherwise ensure the safety of the passengers;  and (d) the presence of a disabled vehicle or an accident in the roadway.

Added by St.1932, c. 271. § 3.  Amended by St.1945, c. 241, § 1;  St.1950, c. 459, § 1; St.1950, c. 502, § 2;  St.1951, c. 196, § 1;  St.1962, c. 515, § 1;  St.1963, c. 199; St.1966, c. 74;  St.1966, c. 149, § 2;  St.1971, c. 803;  St.1973, c. 237, § 1;  St.1973, c. 238, § 1;  St.1973, c. 250;  St.1973, c. 314;  St.1973, c. 497;  St.1973, c. 925, § 12; St.1974, c. 118;  St.1974, c. 555;  St.1975, c. 313;  St.1975, c. 878, § 2;  St.1976, c. 552, §§ 1A to 3;  St.1981, c. 62;  St.1981, c. 519;  St.1983, c. 454;  St.1985, c. 136;  St.1986, c. 245;  St.1986, c. 246;  St.1986, c. 250, § 2;  St.1986, c. 364;  St.1986, c. 456;  St.1988, c. 162;  St.1990, c. 177, § 148;  St.1996, c. 144;  St.1996, c. 247, § 1;  St.1997, c. 164, §§ 83 to 86;  St.1998, c. 470;  St.2000, c. 414

### Historical and Statutory Notes

St.1932. c. 271. § 3 was approved May 27, 1932.

St.1945, c. 241, § 1. approved April 24, 1945, rewrote this section. which prior thereto read:
"No person shall operate any school bus, and the owner or custodian of a school bus shall not permit the same to be operated upon or to remain upon any way, unless the following requirements are complied with: (1) Each school bus shall contain adequate seating accommodations for each passenger transported therein,

provided that any such bus in which adequate and suitable straps, handles or other supports are available for standing passengers may carry not exceeding twenty-five per cent more passengers than those for whom adequate seating accommodations are provided; (2) Each school bus shall be provided with at least two doors, the door for ordinary use to be located near the front and an emergency door to be located on the opposite side of the bus near the rear, or at the rear, which emergency door shall have a

90 § 7B                                    PUBLIC WAYS AND WORKS

minimum lateral clearance of eighteen inches and a minimum vertical clearance of forty-eight inches, and be provided with a fastening device, approved by the registrar, which may be quickly released in case of an emergency, but which shall be protected against accidental release; (3) All such emergency doors shall be so located that no obstruction will prevent the passage of passengers; (4) All doors shall be kept closed while the bus is in motion; (5) Passengers on school buses shall not be permitted to ride on the steps, running board or other appurtenances thereof; (6) Each school bus shall be operated by a person twenty-one years of age or over who is licensed under this chapter; and (7) No fueling shall take place while any school bus is occupied by passengers "

Section 3 of St 1945, c 241, provides:

'The provisions of this act, except those authorizing the making of rules and regulations relative to windshield stickers, so called, and the making of rules and regulations establishing minimum standards for construction and equipment of school buses and except the provisions of section two, shall take effect when the rules and regulations establishing such minimum standards become effective; provided, that the provisions of chapter ninety of the General Laws and of the rules and regulations prepared under section thirty-one of said chapter relative to the construction and equipment of school buses which are in effect immediately prior to the date when rules and regulations relative to such construction and equipment established under authority of this act become effective shall continue to apply in respect to school buses operated as such prior to said effective date "

St 1950, c 459, § 1, approved May 15, 1950, added cl (6)

Section 2 of St 1950, c 459 provides:

"This act shall take effect as to all new school buses on January first, nineteen hundred and fifty-one, and as to all school buses on January first, nineteen hundred and fifty-three "

St 1950, c 502, § 2, approved June 6, 1950, in cl (1), substituted "yellowish orange" for "white or yellow" and added "and such words shall be plainly legible at a distance of at least three hundred feet in the direction towards which they are displayed" in the first sentence and added the second sentence.

St 1951, c 196, § 1, approved April 2, 1951, added cl (7)

St 1962, c 515, § 1, approved May 31, 1962, in cl (4), substituted "section eight A, or who is licensed under section nine of chapter one hundred and fifty-nine A and is subject to an annual physical examination in accordance with the regulations of the carrier employing such person as an operator" for "this chapter"

St 1963, c 199, approved April 1, 1963, added the proviso to cl (4)

St 1966, c 74, an emergency act, approved March 22, 1966, in cl (4), inserted ", twenty-one years of age or over, who is" and "by the registrar" in the first proviso and added the second proviso

St 1966, c 149, § 2, approved April 11, 1966, inserted "red" in cl (7)

St 1971, c 803, approved Sept 22, 1971, added cl (8)

St 1973, c 237, § 1, approved May 1, 1973, rewrote the first sentence of cl (1), which prior thereto read: "(1) The words 'SCHOOL BUS' shall be painted on the front and rear of each such vehicle in black letters of not less than six inches in height and in strokes of not less than three quarters inch in width on a yellowish orange background, or shall be so painted upon signs attached to the front and rear of each vehicle; and such words shall be plainly legible at a distance of at least three hundred feet in the direction towards which they are displayed "

Section 2 of St 1973, c 237, provides:

"The provisions of clause (1) of section seven B of chapter ninety of the General Laws, as amended by section one of this act, shall apply to school buses initially registered in the commonwealth on or after July first, nineteen hundred and seventy-four, and to school buses that are relettered after said date "

St 1973, c 238, § 1, approved May 1, 1973, in cl (6), substituted "Glossy Yellow" for "Chrome" in the first sentence, and "clause" for "requirement" in the second sentence

Section 2 of St 1973, c 238, provides:

"The provisions of clause (6) of section seven B of chapter ninety of the General Laws, as amended by section one of this act, shall apply to school buses initially registered in the commonwealth on or after July first, nineteen hundred and seventy-four, and to school buses which are repainted after said date "

St 1973, c 250, approved May 7, 1973, added cl (9)

St 1973, c 314, approved May 24, 1973, added cl (10)

St 1973, c 497, approved July 2, 1973, added cl (11)

St 1973, c 925, § 12, by § 84 made effective Jan 1, 1984, substituted "eighteen" for "twenty-one" in two places in cl (4)

St 1973, c 925 was approved Oct 17, 1973. Emergency declaration by the Governor was filed Dec 20, 1973.

St 1974, c 118, approved April 16, 1974, rewrote cl (7), which prior thereto read: "(7) Each school bus shall be equipped with front and rear red blinker lights of a type to be

164

roved April 1, 1963, add.
)

emergency act, approved
1 (4). inserted ", twenty-
ver, who is" and "by the
t proviso and added the

. approved April 11. 1966.
").

roved Sept. 22. 1971. add.

. approved May 1, 1973,
nce of cl (1), which prior.
e words 'SCHOOL BUS'.
ne front and rear of each
letters of not less than six
n strokes of not less than
in width on a yellowish
r shall be so painted upon
front and rear of each
ds shall be plainly legible
t three hundred feet in the
iich they are displayed "
. c 237, provides:
lause (1) of section seven
of the General Laws, as
ne of this act. shall apply
ly registered in the com-
r July first, nineteen hun-
and to school buses that
d date "
approved May 1, 1973. in
"Glossy Yellow" for
t sentence, and "clause"
he second sentence.
, c. 238, provides:
lause (6) of section seven
of the General Laws, as
ne of this act, shall apply
ly registered in the com-
July first. nineteen hun-
r. and to school buses
ter said date "
:oved May 7, 1973. added

roved May 24, 1973. add.

:oved July 2, 1973, added

2, by § 84 made effective
ed "eighteen" for "twen-
n cl (4)
approved Oct. 17. 1973
n by the Governor was

roved April 16. 1974, re-
prior thereto read, "(7)
be equipped with front
lights of a type to be

approved by the registrar, which shall be left
flashing when children are entering or leaving
said bus "
    St.1974. c. 555, approved July 18. 1974, add-
ed cl. (12)
    St.1975, c. 313. approved June 10, 1975. add-
ed cl. (13)
    St 1975. c. 878, § 2, approved Jan 14, 1976.
and by § 6 made effective Sept. 1, 1976. re-
wrote this section. which prior thereto read:
    "No person shall operate any school bus, and
the owner or custodian of a school bus shall not
permit the same to be operated upon or to
remain upon any way. unless the following re-
quirements are complied with: (1) The words
'SCHOOL BUS' shall be painted on the front
and rear of each such vehicle in black letters of
eight inches in height and conform to series 'B'
of the standard alphabets for highway signs on
a National School Bus Yellow background, or
shall be so painted upon signs attached to the
front and rear of each vehicle. No motor vehi-
cle shall display such words when it is being
used for purposes other than the transportation
of school children; (2) Each school bus shall
contain adequate seating accommodations for
each passenger transported therein. provided
that any such bus in which adequate straps.
handles or other supports are available for
standing passengers may carry not exceeding
twenty-five per cent more passengers than those
for whom adequate seating accommodations
are provided; (3) All doors shall be kept closed
while the bus is in motion; (4) Each school bus
shall be operated by a person eighteen years of
age or over who is licensed under section eight
A or who is licensed under section nine of
chapter one hundred and fifty-nine A and is
subject to an annual physical examination in
accordance with the regulations of the carrier
employing such person as an operator; provid-
ed. however. that in case of an emergency such
school bus may. for a period not to exceed three
consecutive days, be operated by any person.
eighteen years of age or over. who is duly li-
censed by the registrar to operate a motor vehi-
cle other than as provided herein; and provided
further. that no person shall operate a school
bus whose license to do so is suspended or
revoked, or whose application to operate a
school bus has been rejected by the registrar;
(5) No fueling shall take place while any school
bus is occupied by passengers; (6) Each school
bus body shall be painted a yellowish orange
color similar to what is commonly known as
'National School Bus Glossy Yellow', except
that fenders and trim may be black  This clause
shall not apply to a motor vehicle operated
under a certificate issued under section seven of
chapter one hundred and fifty-nine A and a
permit issued under section eight of said chap-
ter; (7) Each school bus shall be equipped with

front and rear red signal lamps which shall
flash alternately and which shall be left flashing
when children are entering or leaving such bus.
No person who operates such a bus shall permit
the boarding or discharging of passengers
therefrom unless the school bus is stopped as
close as is practicable to the right-hand curb or
edge of the way.  Any person who operates a
school bus shall announce. when discharging
passengers therefrom, that all persons who wish
to cross to the other side of the way shall do so
by passing in front of the bus immediately upon
alighting therefrom.  No person shall operate a
school bus on a way after discharging passen-
gers therefrom unless all persons who wish to
cross to the other side of the way have done so;
(8) Every school bus shall be equipped with a
safety seat belt for the operator thereof. and
said operator shall securely fasten said seat belt
while transporting children; (9) Every school
bus shall be equipped with two operable front
windshield wipers; (10) No person shall smoke
or consume alcoholic beverages on a school bus
while such bus is being used to transport school
children; (11) A stop warning device may be
mounted upon the left side of a school bus and
shall only be activated to extend outward when
picking up or discharging passengers.  Such
device when fully extended shall not protrude
more than twenty-two inches outward from the
left side of the body and shall be constructed
with a break-a-way hinge.  The use of such a
device shall not be construed as increasing the
width of such school bus beyond the limits
prescribed by section nineteen; (12) Every
school bus shall be equipped with at least one
interior mirror. approved by the registrar,
which gives the operator a view of the rear in
accordance with regulations issued by the regis-
trar  Every school bus shall be equipped with
at least two flat-surfaced rectangular exterior
mirrors. approved by the registrar. one situated
on each side of the bus forward of the operator,
and each of said rectangular mirrors shall be
mounted on the bus with a side angle adjustable
convex mirror to provide an additional close-in
field of vision to the operator but so as not to
reduce the visual field of the flat-surfaced mir-
ror below fifty square inches.  Every school bus
shall also be equipped with one convex mirror,
with a diameter of at least seven and one-half
inches. firmly mounted on the bus so that the
seated operator may observe a reflection of the
road from the front bumper forward to a point
where direct observation is possible. and one
convex mirror, with a diameter of at least seven
and one-half inches, firmly mounted at the right
front corner of the vehicle so that the seated
operator may observe a reflection of the ground
surface along the entire right hand side of the
bus; (13) Every school bus shall be equipped
with a first-aid kit "

90 § 7B                                                     PUBLIC WAYS AND WORKS

St 1976, c. 552, § 1A, in cl. (1), deleted a former second sentence, which read: "The legend 'Stop on Signal' shall be removed from the rear on school buses, but emergency exits and identification numbers may be marked."

Section 2 of St 1976, c. 552, in the first sentence of cl. (6), inserted "Beginning with the chassis model year nineteen hundred and seventy-five and subsequent model years" and substituted "United States motor vehicle D.O.T. Safety standard No. 17, as amended" for "federal standards".

Section 3 of St 1976, c. 552, in the second sentence of cl. (7), substituted "front and rear alternating flashing red signal lamps complying with United States motor vehicle D.O.T" for "a front and rear alternating flashing red signal lamp complying with US DOT".

St. 1976, c. 552, was approved Oct. 15, 1976. Emergency declaration by the Governor was filed Oct. 28, 1976.

St. 1981, c. 62, approved April 3. 1981. in cl. (7), inserted the first sentence, and in the second sentence inserted "also" in two places and substituted "the said standard and" for "United States motor vehicle D.O.T. Safety standard No 108,".

St. 1981, c. 519, approved Nov. 5, 1981. added the second paragraph.

St. 1983. c. 454, approved Nov. 2, 1983. in the first paragraph, in cl. (7), in the first sentence, substituted "which may" for "to", in the second sentence, substituted "School buses manufactured on or after January first, nineteen hundred and eighty-four, shall be required to be equipped with the eight-light system, so-called, which shall include" for "Each school bus shall also be equipped with", "complying with said Safety Standard #108" for "also complying with the said standard", "remain" for "be left" and "the bus" for "said bus". and inserted the third and fourth sentences.

St. 1985, c. 136. approved July 3, 1985. in the first paragraph, in the first sentence, in cl. (6), substituted "body and fenders" for "body, fenders and grille", and in the second sentence, inserted "or lusterless yellow".

St. 1986, c. 245, approved July 15, 1986, rewrote cl. (12), which prior thereto read:

"(12) Every school bus shall be equipped with at least one interior mirror, approved by the registrar, which gives the operator a view of the rear in accordance with regulations issued by the registrar. Every school bus shall be equipped with at least two flat-surfaced rectangular exterior mirrors, approved by the registrar, one situated on each side of the bus forward of the operator. and each of said rectangular mirrors shall be mounted on the bus with a side angle adjustable convex mirror to provide an additional close-in field of vision to the operator but so as not to reduce the visual field of the flat-surfaced mirror below fifty square inches. Every school bus shall also be equipped with one convex mirror, with a diameter of at least seven and one half inches. firmly mounted on the bus so that the seated operator may observe a reflection of the road from the front bumper forward to a point where direct observation is possible. and one convex mirror, with a diameter of at least seven and one half inches, firmly mounted at the right front corner of the vehicle so that the seated operator may observe a reflection of the ground surface along the entire right hand side of the bus;"

St. 1986, c. 246, approved July 15, 1986. rewrote cl. (15), which prior thereto read:

"(15) During each school year, each pupil transported in a school bus shall receive classroom instruction in safe riding practices. and participate at least twice in on-bus emergency evacuation drills;"

St. 1986, c. 250, § 2. approved July 15, 1986, and by § 3 made effective Aug. 15, 1989. added cl. (17)

St. 1986, c. 364. an emergency act, approved July 28, 1986. added the third and fourth paragraphs

St. 1986, c. 456. an emergency act, approved Oct. 20, 1986. rewrote cl. (7), which prior thereto read:

"Each school bus shall be equipped with Type 1-Class A turn signal lamps which comply with Federal Motor Vehicle Safety Standard # 108. which shall have a four-way hazard warning signal switch to cause simultaneous flashing of the turn signal lamps which may be activated when a bus is approaching a stop to load or discharge students. and. when needed. as a vehicular traffic hazard warning. School buses manufactured on or after January first, nineteen hundred and eighty-four, shall be required to be equipped with the eight-light system. so-called, which shall include front and rear alternating flashing red signal lamps complying with said Safety Standard # 108, and which shall remain flashing when school pupils are entering or leaving the bus. Said buses shall also be equipped with front and rear alternating amber signal lamps of the same size as, and placed adjacent to, the red signal lamps. and which shall be activated when said bus is approaching a stop to load or discharge students. On buses equipped with the eight-light system. so-called. the use of the four-way hazard warning lamps for the purpose of warning motorists of the vehicle's impending stop to load or discharge pupils shall be discontinued. Use of alternating flashing red signal lamps for any other purpose. and at any time other than when the school bus is stopped to load or discharge pupils shall be

166

s not to reduce the visual
aced mirror below fifty
r school bus shall also be
nvex mirror, with a diam-
and one half inches. firm-
s so that the seated oper-
eflection of the road from
rward to a point where
possible. and one convex
ter of at least seven and
ily mounted at the right
vehicle so that the seated
ve a reflection of the
the entire right hand side

proved July 15, 1986, re-
rior thereto read:

school year, each pupil
ol bus shall receive class-
safe riding practices, and
vice in on-bus emergency

:. approved July 15. 1986,
ctive Aug. 15, 1989, added

emergency act. approved
the third and fourth para-

emergency act. approved
: cl. (7), which prior there-

iall be equipped with Type.
lamps which comply with
e Safety Standard # 108.
four-way hazard warning
: simultaneous flashing of
; which may be activated
aching a stop to load or
id. when needed. as a ve-
l warning. School buses
fter January first, nineteen
iur. shall be required to be
ght-light system, so-called,
ront and rear alternating
mps complying with said
8, and which shall remain
l pupils are entering or
aid buses shall also be
nd rear alternating amber
same size as. and placed
signal lamps, and which
:n said bus is approaching
harge students. On buses
ght-light system. so-called,
ay hazard warning lamps
warning motorists of the
stop to load or discharge
tinued. Use of alternating
nps for any other purpose,
than when the school bus
discharge pupils shall be

prohibited. No person who operates such a bus
shall permit the boarding or discharging of pas-
sengers therefrom unless the school bus is
stopped as close as is practicable to the right-
hand curb or edge of the way. Any person who
operates a school bus shall announce. when
discharging passengers therefrom, that all per-
sons who wish to cross to the other side of the
way shall do so by passing in front of the bus
immediately upon alighting therefrom. No per-
son shall operate a school bus on a way after
discharging passengers therefrom unless all per-
sons who wish to cross to the other side have
done so;"

St.1988, c. 162. approved July 15, 1988, in
the first paragraph. rewrote cl (11), which prior
thereto read. "A stop warning device may be
mounted upon the left side of a school bus and
shall only be activated to extend outward when
picking up or discharging passengers   Such
device when fully extended shall not protrude
more than twenty-two inches outward from the
left side of the body and shall be constructed
with a break-a-way hinge.  The use of such a
device shall not be construed as increasing the
width of such bus beyond the limits prescribed
by section nineteen;"

St.1990. c. 177. § 148, an emergency act.
approved Aug. 7. 1990. in the first paragraph. in
cl (4), substituted "his state of residence for
operation of the class of vehicle being operated
and has said license in his possession" for "the
registrar and has in his possession a valid Class

J or Class 2 Massachusetts motor vehicles oper-
ator's license"

St.1996, c. 144, approved June 28, 1996, in
the first paragraph. in cl. (7). inserted the sev-
enth sentence.

St.1996, c. 247, § 1, approved Aug. 6, 1998,
and by § 2 made effective Sept. 15, 1998, in the
first paragraph, rewrote cl. (2), which prior
thereto read. "Each school bus shall contain
adequate seating accommodations for each pas-
senger transported therein, provided that any
such bus in which adequate straps, handles or
other supports are available for standing pas-
sengers may carry not more than twenty-five
per cent more passengers than those for whom
adequate seating accommodations are provid-
ed".

St.1997. c. 164, §§ 83 to 86, an emergency
act, approved Nov. 25, 1997, in the first para-
graph as amended by both St.1996, c. 144 effec-
tive until September 15, 1998, and St.1996, c.
247. § 1 effective September 15, 1998, in cl. (4)
and in cl. (16), in the second sentence, substitut-
ed "telecommunications and energy" for "pub-
lic utilities"

St.1998. c. 470, approved Jan. 14, 1999. in
the first paragraph, rewrote cl. (17). which prior
thereto read. "Every school bus operated on any
way shall be chassis model year nineteen hun-
dred and seventy-seven or any subsequent mod-
el year" and added cl. (18).

St.2000, c. 414. approved Jan. 12, 2001. add-
ed the fifth paragraph.

### Cross References

Maximum speed of school busses, see c. 90. § 17.
Precautions for vehicle approaching school bus, see c. 90. § 14.

### Code of Massachusetts Regulations

Group day care centers. transportation. vehicle and driver requirements. children's office. see 102
  CMR 7 11

### American Law Reports

Denial, suspension, or cancellation of driver's license because of physical disease or defect. 38
  ALR3d 452.
Liability for negligence in carrying out governmentally required inspection of motor vehicle. 70
  ALR3d 1239

### Library References

Automobiles ⊕115, 365.
WESTLAW Topic No. 48A
C J S. Motor. Vehicles §§ 26, 44. 56. 718.

Comments.
  Transportation of students, see Randall and
  Franklin. 18A Massachusetts Practice
  § 915

Texts and Treatises

7A Am Jur 2d. Automobiles and Highway
  Traffic §§ 207 et seq., 242.
8 Am Jur 2d. Automobiles and Highway Traf-
  fic § 827.
13 Am Jur Proof of Facts 3d 475, Liability of
  School Bus Driver or School for Injury to
  Child Going to or from School Bus

90 § 7B                                    PUBLIC WAYS AND WORKS

WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Preface

## § 7C.   Minimum standards for construction and equipment of school buses

The registrar, after a public hearing, may make, alter, rescind or add to rules and regulations establishing minimum standards for construction and equipment of school buses, which shall apply to all school buses without regard to any prior date when they were operated as such. A violation of any rule or regulation made under this section shall be punished in the same manner as a violation of a rule or regulation made under section thirty-one. Such rules and regulations shall not apply to a motor vehicle operated by a holder of a certificate issued under section seven of chapter one hundred and fifty-nine A and a permit issued under section eight of said chapter.

Added by St.1945, c. 241, § 1.  Amended by St.1948, c. 307;  St.1950, c. 502, § 3; St.1951, c. 419, § 1.

### Historical and Statutory Notes

St.1945, c. 241. § 1. was approved April 24. 1945.

Section 3 of St 1945. c. 241. provides:

"The provisions of this act, except those authorizing the making of rules and regulations relative to windshield stickers, so called, and the making of rules and regulations establishing minimum standards for construction and equipment of school buses and except the provisions of section two, shall take effect when the rules and regulations establishing such minimum standards become effective; provided, that the provisions of chapter ninety of the General Laws and of the rules and regulations prepared under section thirty-one of said chapter relative to the construction and equipment of school buses which are in effect immediately prior to the date when rules and regulations relative to such construction and equipment established under authority of this act become effective shall continue to apply in respect to school

buses operated as such prior to said effective date."

St.1948, c. 307, an emergency act. approved May 12, 1948. deleted "and with the approval of the commissioner and associate commissioners of public works" following "hearing" in the first sentence.

St.1950, c. 502, § 3, approved June 6. 1950, added the third sentence

St.1951. c. 419, § 1, approved June 20. 1951, added ", which shall apply to all school buses without regard to any prior date when they were operated as such" in the first sentence

Section 2 of St 1951. c. 419, provides:

"Rules and regulations made by the registrar of motor vehicles under section seven C of chapter ninety of the General Laws, as amended by section one of this act, so far as they relate to school buses operated as such prior to July first, nineteen hundred and forty-six, shall become effective on September first, nineteen hundred and fifty-two."

### Code of Massachusetts Regulations

Minimum standards for construction and equipment of school buses. motor vehicles registry. see 540 CMR 7.01 et seq.

### American Law Reports

Nature and extent of transportation that must be furnished under statute requiring free transportation of school pupils. 52 ALR3d 1036.

Liability for negligence in carrying out governmentally required inspection of motor vehicle 70 ALR3d 1239.

### Library References

Schools ☞89.15
WESTLAW Topic No. 345

C.J.S. Schools and School Districts §§ 463, 470

168

# MASSACHUSETTS
# GENERAL LAWS ANNOTATED

*Under Arrangement of the Official*
*General Laws of Massachusetts*

## Volume 11
## Chapters 89 to 90
### §§ 1 to 23

## 2005
## Cumulative Annual Pocket Part

Replacing 2004 Pocket Part supplementing 2001 main volume

**Includes laws through the**
**2004 Second Annual Session**

## THOMSON
## WEST

Mat #40362115

10A Mass. Prac. Series § 18.27, Demand Letters-In General.
17A Mass. Prac. Series § 18.17, Proof of Negligence-Violation of Statute by the Defendant.
17A Mass. Prac. Series § 18.47, Comparative Negligence-Unlighted Vehicles and Flare Lights.

17B Mass. Prac. Series § 52.80, Constitutional Defenses-Arrest.

### Notes of Decisions

4. Lights.
Police officer was entitled to stop defendant's vehicle for having only one functioning headlight, even though the automobile was being operated in the daylight; nothing in the statute that required automobiles to have suitable lamps depended on the visibility conditions or the time of day during which the vehicle was operated. Com. v. Feyenord (2004) 815 N.E.2d 628, 62 Mass.App.Ct. 200, review granted in part 2004 WL 3050563. Automobiles ⊂⊃ 349(5)

Police officer's initial investigatory stop of automobile was lawful, where officer had observed commission of offenses of traveling without a rear license plate light and speeding. Com. v. Riche (2001) 741 N.E.2d 871, 50 Mass.App.Ct. 830. Automobiles ⊂⊃ 349(2.1); Automobiles ⊂⊃ 349(5)

## § 7A.  Rules and regulations for periodic inspections of motor vehicles; school buses; fees

### Research References

Treatises and Practice Aids
11 Mass. Prac. Series § 8.16, Seat Belts.
11 Mass. Prac. Series § 20.21, Inspections.

36 Mass. Prac. Series § 26:127, Inspections.
18A Mass. Prac. Series § 9.15, Transportation.

## § 7B.  Equipment and operation of school buses

### Research References

Treatises and Practice Aids
11 Mass. Prac. Series § 8.16, Seat Belts.
11 Mass. Prac. Series § 9.13, Driver's Negligence in Approaching Child.

18A Mass. Prac. Series § 9.15, Transportation.

## § 7D½.  Transportation of vocational school students; motor vehicle requirements; seat belts

### Research References

Treatises and Practice Aids
11 Mass. Prac. Series § 8.16, Seat Belts.
18A Mass. Prac. Series § 9.15, Transportation.

## § 7E.  Display of red or blue lights on vehicles; permits; revocation; violations

### Research References

Treatises and Practice Aids
36 Mass. Prac. Series § 26:126, Equipment Regulations.

18A Mass. Prac. Series § 8.73, Priority in Use of Ways.

## § 7J.  Handlebars on motorcycles; rules and regulations; penalty

### Research References

Treatises and Practice Aids
11 Mass. Prac. Series § 2.23, Obstruction or Interference With Operation of Vehicle

42

**C**

540 CMR:   REGISTRY OF MOTOR VEHICLES

540 CMR 7.00:      MINIMUM STANDARDS FOR CONSTRUCTION AND EQUIPMENT OF
                   SCHOOL BUSES

Section     .

7.01:   Purpose
7.02:   Scope and Applicability
7.03:   Definitions
7.04:   Bus Chassis Standards
7.05:   Bus Body Standards
7.06:   Equipment Requirements
7.07:   Specially Equipped School Bus Standards
7.08:   Out-of-service Criteria

7.01:   Purpose

   540 CMR 7.00 is adopted by the Registrar of Motor Vehicles pursuant to M.G.L. c. 90,
§§ 7A, 7C and 31 to establish uniform standards for the construction, maintenance, and
inspection of school buses.

7.02:   Scope and Applicability

   (1)  The standards established in 540 CMR 7.00 are minimum standards for the construction,
equipping, maintenance and inspection of Type A, B, C, and D school buses, as defined in
540 CMR 7.00, in addition to the applicable Equipment Requirements in M.G.L. c. 90, § 7B.

   (2)  540 CMR 7.00 applies to school bus bodies and chassis placed in production after
January 1, 1989, which shall be constructed in accordance with all applicable Federal Motor
Vehicle Safety Standards (FMVSS) in addition to applicable Massachusetts General Laws and
shall be maintained to assure continued compliance with such construction standards, while used
to transport school pupils.

   (3)  School buses which were manufactured prior to January 1, 1989 in compliance with all
applicable Federal Motor Vehicle Safety Standards, Massachusetts General Laws, and Rules and
Regulations applicable in the model year of the chassis, and continue to or have been retrofitted
to meet such standards, shall be deemed to comply with 540 CMR 7.00.

   (4)  The Registrar, in his or her discretion, may issue a written waiver for any of the
requirements of 540 CMR 7.00 if, after investigation, he or she determines that such waiver is
in the best interest of the public good.

7.03:   Definitions

   Type A.  The Type "A" school bus is a conversion or body constructed on a van-type compact
truck or a front-section vehicle, with a gross vehicle weight rating of 12,500 pounds or less,
designed for carrying more than ten persons.

   Type B.  The Type "B" school bus is constructed utilizing a stripped chassis with a gross vehicle
weight rating greater than 12,500 pounds.  The entrance door is behind the front wheels.

   Type C.  The Type "C" school bus is a body installed on a flat back cowl chassis with a gross
vehicle weight rating of more than 12,500 pounds, designed for carrying more than ten persons.
In a Type C school bus, all of the engine is in front of the windshield and the entrance door is
behind the front wheels.  (May have a left side driver door).

   Type D.  The Type "D" school bus is a body installed on a chassis, with the engine mounted in
the front, midship, or rear, with a gross vehicle weight rating of more than 12,500 pounds,
designed for carrying more than ten persons.  In a Type D school bus, the engine may be behind
the windshield and beside the driver's seat or at the rear of the bus behind the rear wheels, or
midship between the front and rear axles.  The entrance door is ahead of the front wheels.

540 CMR:  REGISTRY OF MOTOR VEHICLES

7.06:  Equipment Requirements

All school buses shall have equipment conforming to the following standards.

(1)  Fire Extinguishers.  The bus shall be equipped with at least one pressurized, dry chemical fire extinguisher complete with hose, to meet Underwriters Laboratories, Inc.'s approval. Extinguisher must be mounted in a bracket, located in the driver's compartment and readily accessible to the driver and passengers.  A pressure gauge shall be mounted on the extinguisher so as to be easily read without moving the extinguisher from its mounted position.
  (a)  The fire extinguisher shall be of a type approved by Underwriters Laboratories, Inc. with a total rating of 2A10BC or greater.  The operating mechanism shall be sealed with a type of seal which will not interfere with the use of the fire extinguisher.
  (b)  An automatic fire extinguisher system may be provided within the engine compartment. This in no way eliminates the requirements 540 CMR 7.06(1)(a).

(2)  First-aid Kit.  The first-aid kit shall be removable, moistureproof, dustproof, and mounted in an accessible and marked place within the driver's compartment. The contents shall include:
  two - 1" x  2½ yards adhesive tape rolls
  24 - sterile gauze pads 3" x 3"
  100 - ¾" x 3" adhesive bandages
  eight - 2" bandage compress
  ten - 3" bandage compress
  two - 2" x 6 yards sterile gauze roller bandages
  two - non-sterile triangular bandages approximately 39" x 35" x 54" with two safety pins
  three - sterile gauze pads 36" x 36"
  three - sterile eye pads
  one - rounded end scissors
  one - pair medical examination gloves
  one - mouth-to-mouth airway

(3)  Body Fluid Clean-up Kit.  Each bus shall have a removable and moistureproof body fluid clean-up kit.  It shall be properly mounted and identified as a body fluid clean-up kit.
  The contents shall include:
  one - Absorbent powder
  one - Hard surface disinfectant towelette
  one - Scoop and spatula
  one - Biohazard bag
  one - Unmarked bag
  ten - Paper towelette
  two - Medical examination gloves
  two - Antiseptic toweletts

(4)  Warning Devices for Disabled Vehicles.  At least three red electric lanterns or red emergency reflectors which comply with United States Department of Transportation Motor Vehicle Safety Standards 125 shall be provided.

(5)  Wheel Chocks.  Each bus shall have one pair of secured rubber chocks, in compliance with M.G.L. c. 90, § 13.

(6)  Storage of Equipment.  All required equipment shall be readily accessible to the driver and passengers and secured to prevent dislodging in the event of vehicle upset.  Any optional equipment or supplies must also be so secured.  Any trash receptacle shall be securely mounted in a proper location and emptied daily.  Any broom shall be securely mounted in a location away from passengers.

(7)  Locked Compartment.  The fire extinguisher, first-aid kit, warning devices, and wheel chocks may be stored under lock and key provided that the locking device is connected with an automatic audible warning signal to notify the driver of the locked compartment when the ignition is turned on, and a device to prevent activation of the starter mechanism of the vehicle engine while said compartment is locked. The compartment shall be legibly labeled to indicate storage of the required equipment.

**D**

**90 § 8**
Note 3

denied 74 S Ct 275, 346 U.S. 915, 98 L.Ed. 411.

License to operate motor vehicle on Massachusetts highways is a privilege granted by the state and is not derived in any way from licensee's status as a citizen of the United States and does not arise from licensee's relationship to the federal government. Wall v. King, D.C.Mass. 1952, 109 F.Supp. 198, affirmed 206 F.2d 878, certiorari denied 74 S Ct 275, 346 U.S. 915, 98 L.Ed. 411.

**4. Age of driver**

A non-resident less than sixteen years of age, though properly licensed in his home state to operate motor vehicles, may not legally operate a motor vehicle in Massachusetts irrespective of the ownership of the vehicle. Op.Atty.Gen. July 14, 1947, p. 10.

**5. Signature**

Where operator has not "endorsed his usual signature on the margin of the license in the space provided for that purpose," the license was invalid. Conroy v. Mather (1914) 104 N.E. 487, 217 Mass. 91.

**6. Physical incapacity**

Failure of applicant for license to operate automobile to disclose his physical incapacity or infirmity does not render the license void.

O'Hare v Gloag (1915) 108 N.E. 566, 221 Mass. 24.

**7. Social security number**

Requiring applicant for renewal of motor vehicle operator's license to disclose his social security number did not constitute unwarranted intrusion upon any constitutional right to privacy of applicant. Ostric v Board of Appeal on Motor Vehicle Liability Policies and Bonds (1972) 280 N.E.2d 692, 361 Mass. 459.

Registrar of motor vehicles may reasonably require applicant for an operator's license to disclose his social security number and to have it placed on applicant's license so that applicant's identity and information concerning his motor vehicle record and history may be conveniently ascertained in the interests of sound motor vehicle regulation and public safety. Ostric v Board of Appeal on Motor Vehicle Liability Policies and Bonds (1972) 280 N.E.2d 692, 361 Mass. 459.

**8. Notice**

To prove receipt of notice of license suspension in prosecution for operating motor vehicle after suspension of license, Commonwealth was only required to prove that registry properly mailed notice. Com. v. Lora (1997) 681 N.E.2d 876, 43 Mass.App.Ct. 136, review denied 691 N.E.2d 580, 425 Mass. 1108.

## § 8A. Operators of school buses; licensing; training; instructors

Application for a license to be a school bus operator may be made by any person who shall have attained the age of eighteen years but who has not passed his seventieth birthday, except as otherwise provided herein, and who shall have been a duly licensed motor vehicle operator for a period of three continuous years immediately prior to his application except a person who has been licensed and whose license is not in force because of revocation or suspension or whose right to operate is suspended by the registrar; but before such person shall be so licensed the registrar shall be satisfied that he is of good moral character and has successfully completed a driving performance test, a visual test, a written test and a physical examination by a licensed physician within a three month period of the date of his application in conformity with such minimum physical qualifications as shall be determined by the registrar; provided, however, that a person who has passed his seventieth birthday and is mentally and physically capable of performing the duties of a school bus operator shall be eligible for a license under this section. Such person shall twice annually, at his own expense, be examined by a physician to determine such capability. Said examination shall not be completed within a six month period of each other and that the first physical examination shall be completed within thirty days prior to the beginning of the school year and the second examination shall not be less than six months nor more than seven months thereafter; provided, further, that no license shall be issued to a person who

216

has been convicted of the crime of rape, unnatural act, sodomy, or the use, sale, manufacture or distribution of or possession with intent to distribute any of the controlled substances which are unlawful under the provisions of section thirty-one of chapter ninety-four C, or to any person who has been convicted of operating a motor vehicle while under the influence of intoxicating liquor or of marijuana, narcotic drugs, depressants or stimulant substances, all as defined in section one of said chapter ninety-four C, or of the vapors of glue, within the preceding five year period under the provisions of section twenty-four. Any person who has consented to have any such case disposed of under the provisions of section twenty-four D shall, for the purposes of this section, be deemed to have been convicted.

All original applicants for a registry of motor vehicles school bus driver's license or a department of telecommunications and energy driver's license when used to drive school pupils to or from school shall have first satisfactorily completed a pre-service school bus driver training program established by the commissioner of education in collaboration with the registrar and the commissioner of the department of telecommunications and energy. In addition, all renewal applicants for a registry of motor vehicles school bus driver's license or a department of telecommunications and energy driver's license when used to drive school pupils to or from school shall have first satisfactorily completed an in-service driver training program established by the commissioner of education in collaboration with the registrar and the commissioner of the department of telecommunications and energy. All original applicants for a registry of motor vehicles school bus driving instructor's certificate shall have first satisfactorily completed an instructor's training program as approved by the registrar. No person shall be employed to provide instruction in any capacity for the operation of school buses unless such person is the holder of such an instructor's certificate issued by the registrar.

Notwithstanding the provisions of section thirty-two G of chapter ninety to the contrary, a person may engage in the business of instructing in pre-service and in-service school bus driver's training programs by being a certified school bus instructor. A private driving school licensed under section thirty-two G may offer pre-service and in-service school bus driver training programs for compensation, provided that such school shall offer said training under the direction of a certified school bus driving instructor.

Applications for a certificate, under this section, may be filed with the registrar and shall contain such information as he shall prescribe. Each such application shall be accompanied by an application fee which in no event shall be refunded. The application fee and an annual fee to maintain said certificate shall be determined by the commissioner of administration under the provision of section three B of chapter seven. No fee or compensation shall be charged in whatever manner to the participants in the pre-service and in-service training courses.

Any such license or special permit or school bus driving instructor's certificate issued under the provisions of this section shall be valid for a period of twelve months from date of issue.

217

# MASSACHUSETTS
# GENERAL LAWS ANNOTATED

*Under Arrangement of the Official*
*General Laws of Massachusetts*

## Volume 11
## Chapters 89 to 90
### §§ 1 to 23

## 2005
## Cumulative Annual Pocket Part

Replacing 2004 Pocket Part supplementing 2001 main volume

**Includes laws through the**
**2004 Second Annual Session**

THOMSON
✳
WEST

Mat #40362115

## § 8A. Operators of school buses; licensing; training; instructors

### Research References

Treatises and Practice Aids

  10 Mass. Prac. Series § 1408, Complaint for Negligence-Death and Conscious Suffering.
  32 Mass. Prac. Series § 582, Operating Without Permit or License; Operating After Suspension of License

36 Mass. Prac. Series § 26:3, License to Operate Motor Vehicles-Types.

## § 8A½. Operators of school buses under section 7D; licensing; exceptions

### Research References

Treatises and Practice Aids

  32 Mass. Prac. Series § 582, Operating Without Permit or License; Operating After Suspension of License.

## § 8B. Learner's permits

*[First paragraph effective until November 18, 2004 For text effective November 18, 2004, see below]*

Any person who is at least sixteen years of age, excepting persons who have been licensed and whose licenses are not in force because of revocation or suspension, and persons whose right to operate is suspended by the registrar, may apply to the registrar for a learner's permit. Each applicant shall submit with his application a birth, baptismal or school certificate or such other satisfactory evidence of his age as the registrar may require. If the registrar has reasonable cause to suspect that any document presented by an applicant as proof of identity or age is altered, false or otherwise invalid, the registrar shall refuse to grant the permit until the registrar is satisfied as to the applicant's true age identity or age. The registrar, in his discretion, after the applicant has successfully passed all parts of the examination other than the driving test, may issue to the applicant a learner's permit which shall entitle him, while having such permit in his immediate possession, to drive a motor vehicle upon any way when accompanied by an operator, duly licensed by his state of residence, who is 21 years of age or over, who has had at least one year of driving experience, and who is occupying a seat beside the driver; provided, however, that in the case of a motorized bicycle, no such accompanying operator shall be required; and provided, further, that if the applicant has been issued a learner's permit restricted to the operation of a motorcycle, said learner's permit shall not entitle him to carry any passenger while operating such motorcycle upon any way or to operate a motorcycle upon any way at any time after sunset or before sunrise. No such motorcycle learner's permit which has expired shall be renewed unless the applicant successfully passes such parts of the examination other than the driving test as the registrar may require; and unless said applicant has taken at least one driving test during the period when the learner's permit was valid. If such applicant fails the driving test twice he shall be required to successfully complete a course of study at an approved rider training school as provided for in section 35G of chapter 10, prior to scheduling a subsequent driving test. Such licensed operator shall be liable for the violation of any provision of this chapter, or of any regulation made in accordance herewith, committed by such persons with a learner's permit; provided, however, that an examiner in the employ of the registrar, when engaged in his official duty, shall not be liable for the acts of any person who is being examined by said examiner. Any such learner's permit shall be valid for two years from the date of issue or until the holder shall have received a license to operate; whichever first occurs.

*[ First paragraph as amended by 2004, 396, Sec. 4 effective November 18, 2004 For text effective until November 18, 2004, see above]*

Any person who is at least sixteen years of age, excepting persons who have been licensed and whose licenses are not in force because of revocation or suspension, and persons whose

**E**

540 CMR 8 00:        SCHOOL BUS DRIVER TRAINING PROGRAMS AND SCHOOL BUS DRIVING
                    INSTRUCTORS

Section

8.01:  Purpose, Scope and Applicability
8.02:  General Qualifications for School Bus Driving Instructor's Certificate
8.03:  School Bus Driving Training Programs (Pre-Service and In-Service) General Requirements
8.04:  Records and Notices

8.01:  Purpose, Scope and Applicability

        540 CMR 8.00 is adopted by the Registrar of Motor Vehicle pursuant to M.G.L. c. 90, § 8A
to establish uniform standards and requirements for the issuance of School Bus Driving
Instructor's Certificates, and for the operation of School Bus Driver Training Programs

8.02:  General Qualifications for School Bus Driving Instructor's Certificate

        (1)   An applicant for a School Bus Driving Instructor's Certificate ("Instructor's Certificate")
shall submit such application and other information as required by the Registrar.

        (2)   In order to qualify for an Instructor's Certificate,  an applicant must have at least two years
of licensed school bus driving experience, in addition to statisfying all of the requirements of
M.G.L. c. 90, § 8A.

        (3)   At all times while instructions are being conducted, the holder of an Instructor's Certificate
shall have the Certificate available for inspection by a police officer or other person authorized
by the Registrar of Motor Vehicles   The instructor shall permit such officer or person to
examine the certificate in hand, and shall sign his or her name if requested to do so by such
officer or person.

8.03   School Bus Driving Training Programs (Pre-Service and In-Service) General Requirements

        (1)   No school bus driving instructor ("Instructor") may certify any person in a school bus driver
training program unless the person has satisfactorily completed a pre-service training program
established under the provisions of M.G.L. c. 90, § 8A consisting of approximately 20 hours,
with a minimum of 16 hours duration, and has passed a written examination with a grade of at
least 75%   Such written examination shall be prepared, administered and evaluated by the
instructor and shall consist of no fewer than 20 questions based on the course content of the
training program.

        (2)   Prior to the commencement of an in-service training program, every applicant for training
shall be required to submit proof of previous qualified training to the Instructor.

        (3)   An applicant for the renewal of a school bus operators' license issued by the Registry of
Motor Vehicles, or by the Department of Public Utilities, may only be certified by an Instructor
after satisfactory completion of an in-service training program in accordance with the provisions
of M.G.L. c. 90, § 8A and of not less than eight hours duration.

        (4)   The Instructor shall notify the appropriate licensing authority under M.G.L. c. 90, § 8A, on
a form prescribed by said authority, of the successful completion of a pre-service or in-service
school bus driver training program by any person.

8.04:  Records and Notices

        (1)   For each bus driver training course conducted, the Instructor shall maintain:
            (a)  a separate, permanently bound book with pages consecutively numbered, containing:
                 1.  an initial page headed by the beginning date of the training program, the Instructor's
                 signature, and each trainee's name and address, accompanied by the notation "Pre-
                 Service" or "In-Service" to indicate the type of training to be conducted;

8.04:  continued

> 2.  a successive page for each lesson, showing the date, time, topic, length of time and location of each lesson, and including the signature of every trainee in attendance who shall sign the page immediately prior to the commencement of each lesson: and
>
> (b)  an individual card file or computer record for each trainee including the trainee's name, address, date of birth, and the date, topic, length of time and location of every lesson received, and the name or initials of the Instructor

(8)  All records required to be maintained under M.G.L. c. 90, § 8A or 540 CMR 8.00, and sample copies of each examination and the grade received by each trainee ("Records") shall be maintained on an up-to-date basis within the custody of the applicable main or branch office of the sponsor of the training program for at least three years following completion of the course to which the Records relate.  Such Records must be available during normal business hours for examination by a police officer or other person authorized by the Registrar of Motor Vehicles

(9)  The Instructor or the custodian of any Records must immediately report to the Registrar by an affidavit the circumstances involving the loss, mutilation or destruction of any Records

(10)  Upon written request, the custodian of the Records required to be maintained by 540 CMR 8.00 shall provide any trainee with a copy of his or her individual training record

REGULATORY AUTHORITY

540 CMR 8.00:  M.G.L. c. 90, § 8A.

**F**

# Bus Drivers

(0*NET 53-3021.00, 53-3022.00)

### Significant Points

- Opportunities should be good, particularly for schoolbus driver jobs.

- A commercial driver's license is required to operate a bus.

- Work schedules vary considerably among various types of bus drivers.

- Bus drivers must possess strong customer service skills, including communication skills and the ability to manage large groups of people with varying needs.

### Nature of the Work

Every day, millions of Americans every day leave the driving to bus drivers. Bus drivers are essential in providing passengers with an alternative to their automobiles or other forms of transportation. Intercity bus drivers transport people between regions of a State or of the country; local-transit bus drivers do so within a metropolitan area or county; motor coach drivers take customers on charter excursions and tours; and schoolbus drivers take children to and from schools and related events.

Drivers pick up and drop off passengers at bus stops, stations, or, in the case of students, at regularly scheduled neighborhood locations based on strict time schedules. Drivers must operate vehicles safely, especially when traffic is heavier than normal. However, they cannot let light traffic put them ahead of schedule so that they miss passengers.

*Local-transit* and *intercity bus drivers* report to their assigned terminal or garage, where they stock up on tickets or transfers and prepare trip report forms. In some transportation firms, maintenance departments are responsible for keeping vehicles in good condition. In others, drivers may check their vehicle's tires, brakes, windshield wipers, lights, oil, fuel, and water supply before beginning their routes. Drivers usually verify that the bus has safety equipment, such as fire extinguishers, first aid kits, and emergency reflectors in case of an emergency.

During the course of their shift, local-transit and intercity bus drivers collect fares; answer questions about schedules, routes, and transfer points; and sometimes announce stops. Intercity drivers may make only a single one-way trip to a distant city or a round trip each day. They may stop at towns just a few miles apart or only at large cities hundreds of miles apart. Local-transit bus drivers may make several trips each day over the same city and suburban streets, stopping as frequently as every few blocks.

Local-transit bus drivers submit daily trip reports with a record of trips, significant schedule delays, and mechanical problems. Intercity drivers who drive across State or national boundaries must comply with U.S. Department of Transportation regulations. These include completing vehicle inspection reports and recording distances traveled and the periods they spend driving, performing other duties, and off duty.

*Motorcoach drivers* transport passengers on charter trips and sightseeing tours. Drivers routinely interact with customers and tour guides to make the trip as comfortable and informative as possible. They are directly responsible for keeping to strict schedules, adhering to the guidelines of the tours' itinerary, and ensuring the overall success of the trip. These drivers act as customer service representative, tour guide, program director, and safety guide. Trips

frequently last more than 1 day. The driver may be away for more than a week if assigned to an extended tour. As with all drivers who drive across State or national boundaries, motorcoach drivers must comply with Department of Transportation regulations.

*Schoolbus drivers* usually drive the same routes each day, stopping to pick up pupils in the morning and return them to their homes in the afternoon. Some schoolbus drivers also transport students and teachers on field trips or to sporting events. In addition to driving, some schoolbus drivers work part time in the school system as janitors, mechanics, or classroom assistants when not driving buses.

Bus drivers must be alert in order to prevent accidents, especially in heavy traffic or in bad weather, and to avoid sudden stops or swerves that jar passengers. Schoolbus drivers must exercise particular caution when children are getting on or off the bus. They must maintain order on their bus and enforce school safety standards by allowing only students to board. In addition, they must know and enforce rules regarding student conduct used throughout the school system.

Schoolbus drivers do not always have to report to an assigned terminal or garage. In some cases, they have the choice of taking their bus home, or parking it in a more convenient area. Schoolbus drivers do not collect fares. Instead, they prepare weekly reports on the number of students, trips or "runs," work hours, miles, and fuel consumption. Their supervisors set time schedules and routes for the day or week.

### Working Conditions

Driving a bus through heavy traffic while dealing with passengers is more stressful and fatiguing than physically strenuous. Many drivers enjoy the opportunity to work without direct supervision, with full responsibility for their bus and passengers. To improve working conditions and retain drivers, many buslines provide ergonomically designed seats and controls for drivers.

Intercity bus drivers may work nights, weekends, and holidays and often spend nights away from home, during which they stay in hotels at company expense. Senior drivers with regular routes have regular weekly work schedules, but others do not have regular schedules and must be prepared to report for work on short notice. They report for work only when called for a charter assignment or to drive extra buses on a regular route. Intercity bus travel and charter work tends to be seasonal. From May through August, drivers may work the maximum number of hours per week that regulations al-



*Drivers must operate vehicles safely and still try to maintain their schedule.*

low. During winter, junior drivers may work infrequently, except for busy holiday travel periods, and may be furloughed at times.

Schoolbus drivers work only when school is in session. Many work 20 hours a week or less, driving one or two routes in the morning and afternoon. Drivers taking field or athletic trips, or who also have midday kindergarten routes, may work more hours a week. As more students with a variety of physical and behavioral disabilities assimilate into mainstream schools, schoolbus drivers must learn how to accommodate their special needs.

Regular local-transit bus drivers usually have a 5-day workweek; Saturdays and Sundays are considered regular workdays. Some drivers work evenings and after midnight. To accommodate commuters, many work "split shifts," for example, 6 a.m. to 10 a.m. and 3 p.m. to 7 p.m., with time off in between.

Tour and charter bus drivers may work any day and all hours of the day, including weekends and holidays. Their hours are dictated by the charter trips booked and the schedule and prearranged itinerary of tours. However, like all bus drivers, their weekly hours must be consistent with the Department of Transportation's rules and regulations concerning hours of service. For example, a driver may drive for 10 hours and work for up to 15 hours—including driving and nondriving duties—before having 8 hours off-duty. A driver may not drive after having worked for 70 hours in the past 8 days. Most drivers are required to document their time in a logbook.

### Employment

Bus drivers held about 654,000 jobs in 2002. Over one-third worked part time. More than two-thirds of all bus drivers were schoolbus drivers working primarily for school systems or for companies providing schoolbus services under contract. Most of the remainder worked for private and local government transit systems; some also worked for intercity and charter buslines.

### Training, Other Qualifications, and Advancement

Bus driver qualifications and standards are established by State and Federal regulations. All drivers must comply with Federal regulations and with any State regulations that exceed Federal requirements. Federal regulations require drivers who operate commercial motor vehicles to hold a commercial driver's license (CDL) from the State in which they live.

To qualify for a commercial driver's license, applicants must pass a written test on rules and regulations and then demonstrate that they can operate a bus safely. A national databank permanently records all driving violations incurred by persons who hold commercial licenses. A State may not issue a commercial driver's license to a driver who has already had a license suspended or revoked in another State. A driver with a CDL must accompany trainees until the trainees get their own CDL. Information on how to apply for a commercial driver's license may be obtained from State motor vehicle administrations.

While many States allow those who are 18 years of age and older to drive buses within State borders, the Department of Transportation establishes minimum qualifications for bus drivers engaged in interstate commerce. Federal Motor Carrier Safety Regulations require drivers to be at least 21 years old and to pass a physical examination once every 2 years. The main physical requirements include good hearing, at least 20/40 vision with or without glasses or corrective lenses, and a 70-degree field of vision in each eye. Drivers must not be colorblind. They must be able to hear a forced whisper in one ear at not less than 5 feet, with or without a hearing aide. Drivers must have normal use of arms and legs and normal blood pressure. They may not use any controlled substances, unless prescribed by a licensed physician. Persons with

epilepsy or diabetes controlled by insulin are not permitted to be interstate bus drivers. Federal regulations also require employers to test their drivers for alcohol and drug use as a condition of employment, and require periodic random tests of the drivers while they are on duty. In addition, a driver must not have been convicted of a felony involving the use of a motor vehicle; a crime involving drugs; driving under the influence of drugs or alcohol; or hit-and-run driving that resulted in injury or death. All drivers must be able to read and speak English well enough to read road signs, prepare reports, and communicate with law enforcement officers and the public. In addition, drivers must take a written examination on the Motor Carrier Safety Regulations of the U.S. Department of Transportation.

Many employers prefer high school graduates and require a written test of ability to follow complex bus schedules. Many intercity and public transit bus companies prefer applicants who are at least 24 years of age; some require several years of experience driving a bus or truck. In some States, schoolbus drivers must pass a background investigation to uncover any criminal record or history of mental problems.

Because bus drivers deal with passengers, they must be courteous. They need an even temperament and emotional stability because driving in heavy, fast-moving, or stop-and-go traffic and dealing with passengers can be stressful. Drivers must have strong customer service skills, including communication skills and the ability to coordinate and manage large groups of people.

Most intercity bus companies and local-transit systems give driver trainees 2 to 8 weeks of classroom and "behind-the-wheel" instruction. In the classroom, trainees learn Department of Transportation and company work rules, safety regulations, State and municipal driving regulations, and safe driving practices. They also learn to read schedules, determine fares, keep records, and deal courteously with passengers.

Schoolbus drivers also are required to obtain a commercial driver's license from the State in which they live. Many persons who become school bus drivers have never driven any vehicle larger than an automobile. They receive between 1 and 4 weeks of driving instruction plus classroom training on State and local laws, regulations, and policies of operating schoolbuses; safe driving practices; driver-pupil relations; first aid; special needs of disabled and emotionally troubled students; and emergency evacuation procedures. Schoolbus drivers also must be aware of the school system's rules for discipline and conduct for bus drivers and the students they transport.

During training, bus drivers practice driving on set courses. They practice turns and zigzag maneuvers, backing up, and driving in narrow lanes. Then, they drive in light traffic and, eventually, on congested highways and city streets. They also make trial runs, without passengers, to improve their driving skills and learn the routes. Local-transit trainees memorize and drive each of the runs operating out of their assigned garage. New drivers begin with a "break-in" period. They make regularly scheduled trips with passengers, accompanied by an experienced driver who gives helpful tips, answers questions, and evaluates the new driver's performance.

New intercity and local-transit drivers are usually placed on an "extra" list to drive charter runs, extra buses on regular runs, and special runs (for example, during morning and evening rush hours and to sports events). They also substitute for regular drivers who are ill or on vacation. New drivers remain on the extra list, and may work only part time, for perhaps several years, until they have enough seniority to be given a regular run.

Senior drivers may bid for the runs that they prefer, such as those with more work hours, lighter traffic, weekends off, or, in the case of intercity bus drivers, higher earnings or fewer workdays per week.

Opportunities for promotion are generally limited. However, experienced drivers may become supervisors or dispatchers, assigning buses to drivers, checking whether drivers are on schedule, re-routing buses to avoid blocked streets or other problems, and dispatching extra vehicles and service crews to scenes of accidents and breakdowns. In transit agencies with rail systems, drivers may become train operators or station attendants. A few drivers become managers. Promotion in publicly owned bus systems is often by competitive civil service examination. Some motorcoach drivers purchase their own equipment and open their own business.

## Job Outlook

Persons seeking jobs as bus drivers should encounter good opportunities. Individuals who have good driving records and who are willing to work a part-time or irregular schedule should have the best job prospects. Schoolbus driving jobs, particularly in rapidly growing suburban areas, should be easiest to acquire because most are part-time positions with high turnover and minimal training requirements. Those seeking higher paying intercity and public transit bus driver positions may encounter competition. Employment prospects for motorcoach drivers will fluctuate with the cyclical nature of the economy, as demand for motorcoach services is very dependent on tourism.

Employment of bus drivers is expected to increase about as fast as the average for all occupations through the year 2012, primarily to meet the transportation needs of the growing general population and the school-age population. Many additional job openings are expected to occur each year because of the need to replace workers who take jobs in other occupations or who retire or leave the occupation for other reasons.

The number of schoolbus drivers is expected to increase as a result of growth in elementary and secondary school enrollments. In addition, more schoolbus drivers will be needed as more of the Nation's population is concentrated in suburban areas, where students generally ride schoolbuses, and less in central cities, where transportation is not provided for most pupils.

Employment growth of local-transit bus drivers will be spurred by increases in the number of passengers and in funding levels. Funding levels for public transit may fluctuate as the public's interest in transportation changes. There may be competition for positions with more regular hours and steady driving routes.

Competition from other modes of transportation—airplane, train, or automobile—will temper job growth among intercity bus drivers. Most growth in intercity bus transportation will occur in group charters to locations not served by other modes of transportation. Like automobiles, buses have a far greater number of possible destinations than airplanes or trains. Due to greater cost savings and convenience over automobiles, buses usually are the most economical option for tour groups traveling to out-of-the-way destinations.

Full-time bus drivers are rarely laid off during recessions. However, employers might reduce hours of part-time local-transit and intercity bus drivers if the number of passengers decreases, because fewer extra buses would be needed. Seasonal layoffs are common. Many intercity bus drivers with little seniority, for example, are furloughed during the winter when regular schedule and charter business declines; schoolbus drivers seldom work during the summer or school holidays.

## Earnings

Median hourly earnings of transit and intercity bus drivers were $14.22 in 2002. The middle 50 percent earned between $10.51 and $18.99 an hour. The lowest 10 percent earned less than $8.37, and the highest 10 percent earned more than $22.51 an hour. Median hourly earnings in the industries employing the largest numbers of transit and intercity bus drivers in 2002 were as follows:

| | |
|---|---|
| Local government | $16.95 |
| Interurban and rural bus transportation | 15.15 |
| Urban transit systems | 15.02 |
| School and employee bus transportation | 11.29 |
| Charter bus industry | 10.64 |

Median hourly earnings of schoolbus drivers were $10.77 in 2002. The middle 50 percent earned between $7.73 and $13.53 an hour. The lowest 10 percent earned less than $6.24, and the highest 10 percent earned more than $16.44 an hour. Median hourly earnings in the industries employing the largest numbers of schoolbus drivers in 2002 were as follows:

| | |
|---|---|
| School and employee bus transportation | $11.44 |
| Local government | 11.09 |
| Elementary and secondary schools | 10.50 |
| Other transit and ground passenger transportation | 9.79 |
| Individual and family services | 8.27 |

The benefits bus drivers receive from their employers vary greatly. Most intercity and local-transit bus drivers receive paid health and life insurance, sick leave, vacation leave, and free bus rides on any of the regular routes of their line or system. Schoolbus drivers receive sick leave, and many are covered by health and life insurance and pension plans. Because they generally do not work when school is not in session, they do not get vacation leave. In a number of States, local-transit and schoolbus drivers employed by local governments are covered by a statewide public employee pension system. Increasingly, school systems extend benefits to drivers who supplement their driving by working in the school system during off hours.

Most intercity and many local-transit bus drivers are members of the Amalgamated Transit Union. Local-transit bus drivers in New York and several other large cities belong to the Transport Workers Union of America. Some drivers belong to the United Transportation Union or the International Brotherhood of Teamsters.

## Related Occupations

Other workers who drive vehicles on highways and city streets include taxi drivers and chauffeurs and truck drivers and driver/sales workers.

## Sources of Additional Information

For information on employment opportunities, contact local-transit systems, intercity buslines, school systems, or the local offices of the State employment service.

General information on schoolbus driving is available from:
➤ National School Transportation Association, 625 Slaters Lane, Suite 205, Alexandria, VA 22314.

General information on local-transit bus driving is available from:
➤ American Public Transportation Association, 1666 K St. NW, Suite 1100, Washington, DC 20006.

General information on motorcoach driving is available from:
➤ United Motorcoach Association, 113 S. West St., 4th Floor, Alexandria, VA 22314.

**G**





# Managing Life Threatening Food Allergies in Schools





**Massachusetts Department of Education**



# *The Commonwealth of Massachusetts*
# *Department of Education*

*350 Main Street, Malden, Massachusetts 02148-5023*

*Telephone: (781) 338-3000*
*TTY: N.E.T. Relay 1-800-439-2370*

*David P. Driscoll*
*Commissioner of Education*

Fall 2002

Dear Superintendents and Other Interested Parties:

The number of students with life-threatening food allergies has increased substantially over the last 5 years. As with all children with special needs, it is important that students with life-threatening food allergies are able to access all education and education-related benefits. Because of the life-threatening nature of these allergies and the increasing prevalence, school districts and individual schools have the challenge to be ready for the entry of students with food allergies by making accommodations related to the school environment and other school and education activities.

To assist schools in developing and implementing policies and comprehensive protocols for the care of students with life-threatening food allergies, the Massachusetts Department of Education led a task force to develop this publication, *Managing Life Threatening Food Allergies in Schools*. The task force included recognized professionals in the area of food allergies, school physicians, school administration, school nutrition/food service directors, school nurses, teachers and Department staff. This group has worked diligently over the past year to create a document that provides background information and practical application regarding life-threatening food allergies in schools.

This guidance focuses on a team approach for addressing life-threatening food allergies and provides information on how to handle situations that may arise. Also included are an introduction on food allergies and anaphylaxis, strategies for issues and possible resolutions for certain areas of the school including the classroom and cafeteria, and various checklists for personnel and school activities.

Although this document covers several aspects of the school day and possible solutions to address the needs of students with life threatening food allergies, each school district will need to review the guide book for application to their district's needs. I hope that this guidance is helpful as you work on this important effort to provide students with life-threatening food allergies with a quality education in a safe environment.

Sincerely,

David P. Driscoll
Commissioner of Education

 **GUIDELINES** · · · ·

## MANAGING LIFE-THREATENING FOOD ALLERGIES IN THE SCHOOLS

### Background

Development of these guidelines was a result of a collaborative effort of the Massachusetts Department of Education, the Asthma and Allergy Foundation of America Foundation: New England Chapter, the Massachusetts School Nurse Organization, the Massachusetts Food Service Association, the Massachusetts Committee of School Physicians, and parents of children with food allergies. Information and advice on this project was provided by the School Health Unit of the Massachusetts Department of Public Health.

### Goal of the Guidelines

The guidelines are presented to assist Massachusetts school districts and nonpublic schools to develop and implement policies and comprehensive protocols for the care of students with life-threatening allergic conditions. The guidelines address:

- The scope of the problem of childhood allergies.

- Types of **detailed** policies and protocols that should be in place in every school to help prevent allergic reaction emergencies and deaths from anaphylaxis,

- The systematic planning and multi-disciplinary team approach needed prior to school entry by the student with life-threatening food allergies,

- The school's role in preventing exposure to specific allergens,

- Emergency management should a life-threatening allergic event occur, and

- The roles of specific staff members in the care of the student with a life-threatening allergic condition.

> *While this document focuses on food allergies, treatment of anaphylaxis (a life-threatening allergic reaction) is the same whether caused by: insect sting; latex; or exercise induced.*

1



## SCHOOL FIELD TRIPS

- The school nurse should be responsible for determining the appropriateness of each field trip and consideration of safety of the student with life-threatening allergies.
- Protocols for field trips should include timely notification to the nurse.
- Whenever students travel on field trips for school, the name and phone number of the nearest hospital will be part of the chaperone's emergency plan.
- Medications including epinephrine auto-injector and a copy of the student's AAP must accompany the student.
- A cell phone or other communication device must be available on the trip for emergency calls.
- Parents of a student at risk for anaphylaxis should be invited to accompany their child on school trips, in addition to the chaperone.
- In the absence of accompanying parents/guardian or nurse, another individual must be trained and assigned the task of watching out for the student's welfare and for handling any emergency. The adult carrying the epinephrine should be identified and introduced to the student as well as the other chaperones. (*Refer to Appendix E, Massachusetts Department of Public Health Regulations Governing Administration of Prescription Medications in Public and Private Schools, for information about obtaining an application from MDPH to register the school/school district to train unlicensed persons to administer medications when the school nurse is not available.*)
- Field trips need to be chosen carefully; no student should be excluded from a field trip due to risk of allergen exposure.
- Hand wipes should be used by students and staff after consuming food.

## SCHOOL BUS

- Eating food should be prohibited on school buses.
- School bus drivers shall be trained by appropriate personnel in risk reduction procedures, recognition of allergic reaction, and implementation of bus emergency plan procedures.
- With parental permission, school bus drivers will be provided with the Allergy Action Plan of all students with LTAs. (See Appendix G.)
- The school bus must have a cell phone or other means of communication for emergency calls.

## GYM AND RECESS

- Teachers and staff responsible for gym or recess should be trained by appropriate personnel to recognize and respond to exercise-induced anaphylaxis, as well as anaphylaxis caused by other allergens.
- Staff in the gym, playground and other sites used for recess should have a walkie-talkie, cell phone or similar communication device for emergency communication.
- If for safety reasons medical alert identification (i.e. ID bracelet) needs to be removed during specific activities, the student should be reminded to replace this identification immediately after the activity is completed.

## RESPONSIBILITIES OF THE SCHOOL BUS COMPANY

____ Provide a representative from the bus company for Team meetings to discuss implementation of a student's IHCP.

____ Provide training for all school bus drivers on managing life-threatening allergies (provide own training or contract with school).

____ Provide functioning emergency communication device (e.g., cell phone, two-way radio, walkie-talkie or similar).

____ Know local Emergency Medical Services procedures.

____ Maintain policy of no food eating allowed on school buses.